**Robert STEPP, Plaintiff,**

v.

**FORD MOTOR CREDIT COMPANY, Defendant.**

**Civ. A. No. 80–C–776.**

United States District Court, E.D. Wisconsin.

Dec. 18, 1985.

---

Dennis Grzezinski, Frisch, Dudek & Slattery, Milwaukee, Wis., for plaintiff.

Jon P. Christiansen, Foley & Lardner, Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This case is before the court on defendant Ford Motor Credit Company's (FMCC) motion for summary judgment. The motion will be granted in part and denied in part.

Robert Stepp seeks compensatory and punitive damages from FMCC for violations of § 2 of the Sherman Act, § 3 of the Clayton Act, the Federal Dealers Day-in-Court Act (15 U.S.C. § 1221, *et seq.*), § 218.01, Wis.Stats., § 133.03, Wis.Stats., and numerous common law claims. Stepp's complaint is neither modest nor selective [1]. Seventeen different causes of action are presently being pursued.

Summary judgment motions may be granted where no genuine issue of material fact is in dispute. Where, as a matter of law, a plaintiff will not be able to prevail at trial, summary judgment should be granted. Disputed facts, however, must be resolved in favor of the party opposing the summary judgment motion. *Trotter v. Anderson,* 417 F.2d 1191 (7th Cir.1969). *Janowiak v. City of South Bend,* 750 F.2d 557 (7th Cir.1984). In reviewing the facts here, they are viewed in the light most favorable to the plaintiff.

### I. FACTS

Stepp became the business manager of Jack White, Inc. (JWI), a Milwaukee area Ford dealership, in 1964. He became a minority shareholder in the dealership in 1972, and in January, 1979, he became the majority stockholder and president. On August 29, 1979, JWI was sold to Russell Darrow, Jr.

Stepp was associated with JWI for fifteen years, and during this time FMCC provided JWI with wholesale financing credit known as "floor planning". Wholesale financing is necessary for automobile dealerships to purchase the cars with which they stock their showrooms. Wholesale financing is extended directly to the dealership, rather than the ultimate purchasers of the automobiles. JWI, as the largest Ford dealership in Wisconsin, required approximately $2.5 million of wholesale financing between 1965 and 1975. After 1978, as a condition for this financing, FMCC required Stepp and other JWI stockholders to submit yearly personal financial statements, to personally guarantee JWI's obligations, and to keep JWI's capitalization at a specific level.

Automobile dealerships commonly obtain wholesale financing through a subsidiary finance company of the automobile manufacturer with whom they do business. That is, Chrysler dealers commonly obtain wholesale financing through the Chrysler Credit Corporation, while Ford dealers commonly obtain wholesale financing through FMCC. Wholesale financing is also available from other sources such as banks or independent finance companies; however, these institutions may be unable, or in some cases unwilling, to supply the financing necessary to keep a large dealership in business.

In 1964, JWI and FMCC entered into a wholesale financing and security agreement wherein FMCC held a security interest in JWI's new vehicle inventory. FMCC paid Ford Motor Company directly for Ford products which were sent to the dealers, and in turn the dealers were to pay FMCC. The dealers' obligations to FMCC are found in a "security agreement and promissory note".

---

**1.** In my June 18, 1981, decision here I called Stepp's 42-page, 154-paragraph complaint "bulky". In the four years that have passed since that decision, the parties have taken 29 depositions, exchanged 9 sets of interrogatories, presented 7 sets of document production requests, and produced "hundreds of thousands" of documents. Needless to say, the case is getting more bulky every day.

From 1964–79, FMCC also provided retail financing to automobile consumers, which involves the financing of installment contracts. These installment contracts, known as retail paper, are usually sold by automobile dealers to financing institutions or a credit company such as FMCC. Retail financing is profitable, but dealers often sell the installment contracts because they cannot afford to administer them themselves.

JWI did not sell all of its retail paper to FMCC. Instead, JWI sold retail paper through a private purchase plan financed by the M & I Bank. The purchase plan competed with FMCC in making small loans to automobile purchasers. This arrangement was profitable both to JWI and the M & I Bank. Some of JWI's retail paper was also sold to other banks; and some consumers had their contracts financed through their own personal banks. JWI thus spread its retail paper around rather than selling it all to one institution; JWI's management believed that in doing so it would better serve its customers. In 1970, JWI gave FMCC approximately 10% of its retail paper business.

Until 1975, FMCC based its flat rate finance charge for JWI's wholesale financing on the amount of retail paper which it was able to purchase from JWI. That is, the more retail paper it got the lower the flat rate charge for wholesale financing. This practice was abolished at the end of 1974.

In April of 1978, FMCC's Milwaukee district manager, Pat Barrett, informed Stepp and other stockholders that, in FMCC's mind, JWI was undercapitalized. This decision was based on FMCC's determination of JWI's "tangible base capital" (TBC), a measure of capitalization and liquidity used in measuring the credit-worthiness of its dealer borrowers. TBC is determined by subtracting certain assets which are not easily converted to cash, for example leasehold improvements, from the dealership's net worth. Stepp and JWI's other principal shareholders were unaware (at least I must on this motion accept as true the fact that they were unaware) of FMCC's method of

calculating TBC, and were unaware that FMCC regarded their capitalization as a problem. Barrett requested that JWI increase its tangible base capital by $100,000. He also requested that FMCC be provided with the personal guarantees of JWI stockholders Stepp, John White and Dale Knight, subordinate a $42,000 note due White, and provide certified annual financial statements. These requests, it is said, came as a shock to Stepp because of JWI's excellent reputation and status as a major Ford dealership.

There has been substantial evidence presented to the effect that FMCC wished to receive a larger share of JWI's retail paper. Jack White and Stepp both testified during depositions that Barrett told them in 1978 that had they sold more retail paper to FMCC, JWI would not have been placed in the difficult situation with respect to its capitalization. White indicated that Barrett constantly and aggressively sought to increase the amount of retail paper which JWI sent to FMCC. Additionally, Frederick Mueller, a Ford dealer who considered investing in JWI, testified that he was informed by Barrett that "in the event you do decide to [buy into JWI] and we provide this capital loan, ... we are going to expect a good share, a good opportunity to buy your retail paper." FMCC has presented conflicting testimony which tends to show that no coercion or tying was present. FMCC employee John Golden testified that he would not have pressured JWI to increase the retail paper it sent to FMCC by threatening to withdraw JWI's wholesale financing.

On June 30, 1978, Barrett told Stepp, White and Knight that FMCC would no longer provide JWI with wholesale financing. This caused JWI's management grave concern, and on July 6, 1978, Stepp met with Barrett in an attempt to salvage the financing. Barrett, according to Stepp, began the meeting by stating that some dealers were ideal because they gave FMCC all of their retail paper, and that JWI would have to give FMCC more retail paper if JWI wished its wholesale financing to con-

tinue. At the July 6 meeting, or as a result of it, Stepp agreed to meet the four conditions that FMCC had established in April. Stepp also agreed to increase the amount of retail paper that JWI gave to FMCC. Former JWI employees Bender and Rossi have indicated, however, that they were not told to increase the retail paper sent to FMCC. According to FMCC, an agreement was reached between Stepp and Barrett that JWI would maintain a tangible base capital level of $650,000. Barrett told Stepp that FMCC's wholesale financing depended upon the maintenance of this figure. To meet the required TBC, Stepp invested an additional $100,000 in the dealership as had been requested in April of 1978. In January of 1979, Stepp became the majority shareholder and president of JWI.

In late 1978 and early 1979, JWI's sales were declining. In April of 1979, Barrett once again indicated that JWI was undercapitalized. Barrett told Stepp that JWI needed to increase its capitalization by $200,000. Stepp then decided to look for an investor for the dealership in order to raise the capital. Mueller, at this time, was considering buying into the dealership, and he and Stepp sought financing from FMCC and Ford Motors' Dealer Development Division. On June 18, 1979, Stepp was informed that Ford only provided dealer development money to new dealerships and, as JWI had been in existence for over twenty years, it was not eligible. (However, it is said that funds were later provided from the Dealer Development Division to the owner of another existing Milwaukee area Ford dealership.)

On June 21, 1979, Barrett sent a memo to his area manager recommending that JWI's wholesale financing be suspended due to JWI's poor financial condition. On June 28, 1979, Barrett told Stepp that FMCC would no longer provide wholesale financing on new cars for JWI. This action was taken one day before a scheduled meeting between Stepp, Mueller, White and representatives of Ford's District Sales office concerning Mueller's potential investment into JWI. At the June 29 meeting,

Barrett informed Stepp and Mueller that if the wholesale line were reinstated, tangible base capital levels would have to be maintained or the dealership would risk withdrawal of its credit line. During the meeting Stepp presented a capital loan application. The application included a security agreement giving FMCC a chattel mortgage in most of JWI's property and the property's proceeds. According to Stepp, the security agreement and the conditional assignment were signed only in connection with the capital loan application. FMCC, however, argues that the security agreement was not dependent upon the approval of the capital loan application.

On July 1, 1979, Mueller apparently got cold feet and decided not to invest in JWI. Mueller stated that he feared continuing dealership losses and believed that without financing from FMCC the dealership could not be turned around.

On July 2, Stepp told Barrett of Mueller's decision, and requested the return of the security agreement and assignment. Barrett refused, and on July 2, FMCC filed the financing statement with the Wisconsin Secretary of State in Madison. The filing gave FMCC a secured interest in all of JWI's assets and effectively prevented Stepp from applying to other lenders for temporary financing.

Stepp began looking for another buyer for JWI. Initially, Ford Motors' representative David Marston introduced Stepp to Francis Auffenberg, who prepared an offer to purchase JWI. The offer included a provision under which Stepp would retain part ownership and continue as general manager. On August 7, 1979, White, Stepp and Auffenberg met to discuss the offer, but during the meeting Stepp received a call from Marston, who told him not to sign anything because FMCC had found another potential buyer, Russell Darrow, Jr.

FMCC was enthusiastic about Darrow, and took steps to expedite the sale. During this time, JWI was without wholesale financing and could not order new Ford

products for stock customers. The inability to order prevented JWI's compliance with its Ford Motor franchise agreement. The stock of JWI was sold to Russell Darrow on August 29, 1979.

The main contentions of Stepp's complaint involve the allegation that FMCC's actions were motivated by a desire to coerce him to cause JWI to give FMCC more of its retail paper. If Stepp would not comply, FMCC wished to replace him with another dealer who would. Stepp's complaint also alleges that JWI's inability to fulfill the franchising agreement with Ford Motor Company stemmed from the financial control that FMCC held over JWI through the wholesale financing plan. This financial control forced Stepp to make the sale to Russell Darrow on disadvantageous terms. FMCC has moved for summary judgment on each of Stepp's 17 claims.

## II. Standing

Initially, FMCC once again challenges the plaintiff's standing to bring this action. FMCC contends that plaintiff lacks standing to raise his claims under the Sherman Act, the Clayton Act, the federal Dealers Day-in-Court Act, Wisconsin Statutes § 133.03 and § 218.01, and common law. I previously ruled that Stepp had standing to pursue his claims. See my decision of June 18, 1981. At defendant's behest, I will reconsider my previous decision.

▪ I believe that my original decision on the standing issue under the Sherman Act was correct. Under the criteria established by *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), Stepp has standing to pursue his Sherman Act claims. The *Associated General Contractors* case teaches that in determining whether a plaintiff has antitrust standing the court must examine (1) the causal connection alleged between the injury and the defendant's conduct, (2) the nature of plaintiff's injury, (3) the nature of the damages alleged, (4) the directness of the injury claimed, and (5) the existence of more di-

rect victims of the defendant's conduct. In this case, a direct causal connection is alleged between plaintiff's injury, being driven out of business and subsequent financial loss, and defendant's alleged misconduct, a tie-in between retail and wholesale financing, monopolization, and retributive acts. Plaintiff's injury is of the type intended to be redressed by the antitrust laws. Plaintiff suffered a loss in his business and property: he lost his employment as the head of JWI and the value of his JWI stock. His damages are not speculative, nor is his injury indirect.

▪ Similarly, Stepp has standing under the Dealers Day-in-Court Act, 15 U.S.C. § 1221, *et seq.* FMCC argues that Stepp does not have standing because he was not a person under the Dealers Day-in-Court Act and any rights under 15 U.S.C. § 1221, *et seq.* accrued to JWI rather than Stepp, its majority stockholder. Originally, I pierced the veil of corporate entity because it was clear that the purposes of the Dealers Day-in-Court Act would not be furthered by permitting FMCC to hide behind the corporate structure of JWI, now defunct. This decision, I believe, was correct.

▪ FMCC now asserts that a credit company cannot be said to be a manufacturer, nor is it a distributor of automobiles, and therefore it is an improper defendant under 15 U.S.C. § 1222. Where there is an inference of control over the credit subsidiary by the parent company, however, a credit company is a proper defendant. *See, e.g., Colonial Ford, Inc. v. Ford Motor Co.*, 592 F.2d 1126 (10th Cir.1979), *cert. den.*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48; *De Valk Lincoln-Mercury, Inc. v. Ford Motor Co.*, 550 F.Supp. 1199, 1202–03 (N.D.Ill.1982); *Imperial Motors, Inc. v. Chrysler Corp.*, 559 F.Supp. 1312, 1315 (D.Mass.1983). Control is established by showing that the credit company was a wholly owned subsidiary and that its involvement with the plaintiff was exclusively for the purpose of facilitating the distribution of automobiles manufactured by the parent company. It is quite clear that

FMCC's involvement with Robert Stepp was exclusively for the purpose of selling Ford automobiles. An allegation of agency may be inferred from the complaint, and therefore, I hold that FMCC is a proper defendant under 15 U.S.C. § 1221, *et seq.*

■ Similarly, my original decision as to Stepp's standing to pursue his claim under Wisconsin Statutes § 218.01 was correct. I note but at this point I am unmoved by FMCC's argument regarding the Wisconsin Transportation Commission's decision in the *Matter of the Revocation or Suspension of the Distributor's License of Volkswagen of America, Inc.*, Case No. H–108 (August 11, 1981).

■ Lastly, my prior decision regarding plaintiff's standing to assert his common law claims was also correct. Therefore, I will proceed to review the merits of FMCC's motion for summary judgment.

### III.

#### Stepp's Antitrust Claims

Stepp has raised five antitrust claims [2]: monopolization and attempted monopolization under § 2 of the Sherman Act, a tie-in violating § 3 of the Clayton Act, and conspiracy to monopolize in violation of § 2 of the Sherman Act and Wis.Stats. § 133.03.

■ The offense of monopolization under § 2 of the Sherman Act requires two elements: the offending corporation must possess monopoly power in the relevant market; and the corporation must have wilfully acquired or maintained that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The initial problem in analyzing any antitrust claim is the definition of the correct market. Here, the appropriate geographic market is the Milwaukee metropolitan area. Defining the relevant product market, however, is a hotly disputed issue.

Two product markets are involved in this case: the wholesale financing credit market and the retail financing credit market. Stepp asserts that FMCC has monopolized the wholesale financing credit market for Ford automobile dealers. He also argues that FMCC has attempted to monopolize the retail financing credit market for Ford automobiles and has effected an unlawful tie-in violating § 3 of the Clayton Act by tying the provision of wholesale financing to its ability to purchase retail installment contracts from automobile dealers.

Stepp contends that the relevant product markets are the wholesale financing credit for Ford automobile dealers and the retail financing of Ford automobiles. In contrast, FMCC claims that the appropriate product market is the entire credit market, encompassing all forms of credit. FMCC's expert, John Nevin, stated that because credit is fungible and sellers move in and out of segments of the market, all credit constitutes a single market.

The controlling concept for market definition in this case is that of cross-elasticity or reasonable substitutability. Where different products may be substituted easily for each other, they are part of the same product market. Cross-elasticity varies according to many factors including price, uses, barriers to entry by new firms, physical characteristics, public or economic recognition of submarkets, distinct customers, or specialized vendors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); P. Areeda and D. Turner, *II Antitrust Law*, §§ 525, 526 (1978). Cross-elasticity differs depending upon the buyer's or seller's point of view. A product may have a great amount of cross-elasticity for a seller who regards the producers of slightly different products as competitors, but little cross-elasticity for certain buyers who, regardless of price, must continue to use a specific product. The exact measure of cross-elasticity is determined by the number of buyers who, at a specified price, will shift and buy a different product. The greater

---

**2.** Seventeen of the original claims raised in the Amended Complaint remain in this case. They are claims numbered 3 to 7, 9, 11 to 17, 19, 20, 21, and 24.

the number of reasonable substitutes, the higher the measure of cross-elasticity.

FMCC relies on a concept of cross-elasticity solely based on the credit seller's perspective, and urges that the entire credit market is the correct product market. The United States Court of Appeals for the Seventh Circuit has frequently stated that a market definition which focuses on sellers and ignores buyers is not meaningful. *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir.1977), *cert. denied*, 439 U.S. 822, 99 S.Ct. 87, 58 L.Ed.2d 113. Credit sellers such as FMCC correctly regard banks, finance companies and other special credit providers as competitors. Credit buyers, however, have more limited options; they are constrained by the amount of credit which they may require, as well as the type of collateral which they can offer. Barriers to entry in the credit market further limit buyer's options.

In this case, a number of factors are appropriately considered in determining the product market. First, credit is fungible; money is, after all, only money. Credit differs, however, as to the terms upon which it is provided, the quantities in which it is available, and the regularity of its availability. Stepp has presented evidence that FMCC, along with GMAC and Chrysler Credit were the steadiest and most generous sources of automobile dealership financing. Second, automobile dealers are distinct customers, requiring large amounts of credit with limited collateral and, often, low cash reserves. Third, FMCC, GMAC, and Chrysler Credit are specialized vendors. They provide credit in order to facilitate the sale of their parent company's automobiles, although they apparently provide other types of loans as well.

Evidence has been presented which shows that the primary sources of wholesale financing are the automobile manufacturer's subsidiary credit corporations. Ford dealerships, for example, receive the bulk of their wholesale financing from FMCC, while General Motors dealers receive most of their financing from GMAC. There are, however, other sources for wholesale financing. Certain banks are able and willing to extend certain amounts of wholesale financing; JWI received $250,-000 of wholesale financing from the M & I Bank in the 1970s in order to finance its recreational vehicle line. The amount of wholesale financing available from banks and independent finance companies is disputed in this case and, indeed, appears to vary according to economic conditions. No convincing figures have been presented by either party as to the amount of credit which banks are or are not willing to extend to automobile dealerships. It seems clear, however, that in periods of tight credit, banks generally tend to withdraw from the extension of wholesale financing. Furthermore, banks may be unwilling to extend the total amount of wholesale financing credit required by large automobile dealerships such as JWI. It thus appears that there is a submarket of steady wholesale financing available to automobile dealers which is provided by FMCC, GMAC, and Chrysler Credit, as well as certain banks and independent finance companies. *See Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1332 (7th Cir.1981).

FMCC asserts that wholesale financing is not a relevant product market because credit supplied to one buyer may move to another segment of the market due to economic changes. This, however, further indicates that wholesale financing for automobile dealers is a distinct submarket for antitrust analysis. If only three major financers are regularly in the business of financing wholesale credit for automobile dealers, then the market for wholesale financing is a limited one. Both the distinct character of automobile dealers as buyers and the specialized nature of FMCC as a vendor support the notion of a submarket consisting of wholesale financing for automobiles. Based on the facts presented thus far I hold that the correct product market in this case is wholesale financing available to automobile dealers.

In doing so, I reject Stepp's proposed submarket of wholesale financing to Ford dealers. A Ford dealer competes with other auto dealers for non-Ford financing. Plaintiff's proposed market definition is too narrow to encompass the variables of antitrust analysis.

Moreover, I also believe that there is a distinct submarket for the retail financing of automobiles to consumers. This market consists, as does wholesale financing, of banks, independent finance companies, and FMCC, GMAC, and Chrysler Credit. Credit available to consumers in the financing of retail contracts is very different from that available to automobile dealers or other credit purchasers. Therefore, two submarkets exist for the purposes of this case: the wholesale financing for automobile dealers submarket and the retail financing for consumers submarket.

 Having defined the relevant markets, the next issue is whether FMCC may be said to have successfully monopolized the relevant submarket in violation of § 2 of the Sherman Act. As a matter of law, a successful monopolization claim requires a very large market share of the relevant market. Generally, a 75–80% share of the market is required in order to make out a successful monopolization finding under § 2. *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945). FMCC's share of the wholesale financing market for Ford dealers is estimated at 69%. FMCC's share of wholesale financing for all new vehicles (a market comparable to the submarket which I defined), however, is estimated at between 13.4% and 27.3%. Even accepting the figure of 27.3% as correct, Stepp has failed to demonstrate the existence of a monopoly within the automobile wholesale financing market. Therefore, FMCC's motion for summary judgment is granted as to the Third cause of action.

 Similarly, Stepp's Fourth cause of action for the attempted monopolization of retail financing must be dismissed. A successful claim for attempted monopolization has three requirements: the specific intent to monopolize, predatory or unlawful conduct in furtherance of the monopolization, and the dangerous probability of success. *Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704 (7th Cir.1979), *cert. den.,* 445 U.S. 917, 100 S.Ct. 1278, 63 L.Ed.2d 601 (1980).

The market which FMCC is accused of attempting to monopolize is the retail financing credit market for automobiles. Intent is sufficiently demonstrated by plaintiff's affidavits as to the alleged tying activity which, if it occurred, could also constitute the unlawful or predatory conduct required for an attempt claim. There is a dispute of material fact as to whether a tie-in occurred; conflicting testimony has been presented by both sides as to whether FMCC employees attempted to condition the receipt of wholesale financing upon the sale of retail paper. Because there is evidence of tying which if proven at trial could manifest the necessary predatory conduct, I have found it necessary to examine whether FMCC possessed the dangerous probability of success.

 Most courts and commentators are agreed that where a company's absolute market share is small, it may not be liable for attempts to monopolize because there is no dangerous probability that it will succeed. *See, e.g., Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 490–91 (5th Cir.1984); *White & White, Inc. v. Amer. Hospital Supply Corp.,* 723 F.2d 495, 507–08 (6th Cir.1983); *Dimmit Agri. Indus., Inc. v. CPC Int'l Inc.,* 679 F.2d 516, 529 (5th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344; *Transource Int'l Inc. v. Trinity Indus. Inc.,* 725 F.2d 274 (5th Cir.1984); *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540; *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290 (7th Cir.1974); Areeda & Turner, *III Antitrust Law,* ¶ 835 at 350 (1978). There is some evidence that FMCC has successfully increased its market share of retail financing. This evidence, however, is in-

sufficient as a matter of law to withstand FMCC's summary judgment motion. FMCC's expert's figures indicate that between 1977 and 1979 FMCC's share of the retail paper market doubled from 4.3% in 1977 to 8.5% in 1979. Although this is a considerable increase in market share for a two-year period, FMCC's absolute market share is so small that it cannot be held responsible for attempted monopolization.

Stepp's claim for violation of § 3 of the Clayton Act must also be dismissed. Stepp's Seventh cause of action is that FMCC used its market power in the tying product market, wholesale financing, to obtain power in the tied product market, retail financing. The Clayton Act is applicable as regards this case to commodities, rather than services or intangibles. *See* L. Sullivan, *Handbook of the Law of Antitrust,* § 151 (1977). Although I previously held in my June 18, 1981 decision that credit was a commodity within the scope of the Clayton Act, I have some doubts now about that decision and am inclined to hold that credit is not a commodity triggering the application of § 3. *Id. Bouldis v. U.S. Suzuki Motor Corp.,* 711 F.2d 1319, 1330 (6th Cir.1983). However, I need not bite into that apple today, as a number of other deficiencies are present in this claim.

■ First, FMCC has not tied the sale of one of its products (wholesale financing) to the "sale" of another of its products. Here, Stepp claims that FMCC would not sell its product unless JWI sold its retail paper. The claim here does not fit the traditional tying pattern. *See Holleb & Co. v. Produce Terminal Cold Storage Co.,* 532 F.2d 29, 32 (7th Cir.1976). Also, Stepp's factual allegations do not satisfy the policy behind the tying prohibition found in the Clayton Act.

Furthermore, no tying in fact has occurred here nor has a significant amount of interstate commerce been affected. Accordingly, the Seventh cause of action is dismissed.

FMCC has moved for summary judgment on Stepp's Fifth and Sixth claims for relief, claims for conspiracy to monopolize the retail financing market under § 2 of the Sherman Act and § 133.03 Wis.Stats.

■ The Supreme Court recently held in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 952, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that a parent company may not conspire with its wholly owned subsidiary to violate § 1 of the Sherman Act. Section 1 of the Sherman Act is intended to reach unreasonable restraints of trade which are affected by conspiracy between separate entities but does not reach wholly unilateral conduct. *Id.,* 104 S.Ct. at 2740. In this case the only remaining defendant is FMCC; Ford Motor Company has been dismissed from the action. The Supreme Court held in the *Copperweld* case that a corporation may not conspire with its wholly owned subsidiary to violate § 1 of the Sherman Act. Although this claim is made under § 2 of the Sherman Act, I can see no distinguishing factor; there are no allegations against a party other than FMCC and Ford Motor, who has since been dismissed. Section 133.03 Wis. Stats. is comparable to the Sherman Act. *Independent Milk Producers Co-op v. Stoffel,* 102 Wis.2d 1, 298 N.W.2d 102 (Ct. App.1980). Therefore, defendant's motion for summary judgment is granted as to Stepp's Fifth and Sixth causes of action.

■ FMCC has moved for summary judgment on Stepp's Eleventh and Twelfth causes of action, for violations of §§ 218.01 and 218.01(7), Wis.Stats. FMCC contends that there is no evidence of retributory action against Stepp for his failure to provide them with the amount of retail paper which they wished to receive. There is a genuine issue of material fact in dispute as to retribution. For example, Stepp contends that retribution is shown by Patrick Walsh's deposition testimony; he testified that it would be highly unusual to terminate the wholesale financing credit line of a dealership in the position of JWI. Second, Stepp argues that retribution can be inferred from his conversations with Patrick Barrett regarding FMCC's desire for retail paper. Third, Stepp argues that certain

memoranda indicate retribution; and fourth, that the timing of the termination of the wholesale financing credit line shows retribution. In contrast, FMCC argues that the testimony of FMCC's Barrett shows that no retribution occurred. There is clearly an issue of disputed fact here as to intent and it must be resolved, on summary judgment, in favor of Stepp.

Similarly, the Ninth cause of action, also based on retributory acts under the federal Dealers Day-in-Court Act, may not be dismissed.

■■■ The Thirteenth cause of action, for breach of fiduciary duty in regard to the security agreement and assignment between JWI and FMCC, must be dismissed. No fiduciary duty exists by virtue of a contractual agreement. There is no fiduciary duty between a franchisor and its franchisees. *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 711 (7th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 432, 83 L.Ed.2d 359; *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 354 (7th Cir.1982); *St. Joseph Equipment v. Massey Ferguson, Inc.*, 546 F.Supp. 1245, 1251 (W.D.Wis.1982). This is not to say that every contract does not impose a duty of good faith; however, a fiduciary duty is distinguished from the normal duty of good faith and fair dealing. The law is clear in this regard and, therefore, the Thirteenth cause of action must be dismissed.

■■■ Plaintiff's Fourteenth cause of action is for fraud. Genuine issues of material fact exist as to intent: FMCC argues that it would have suspended JWI's line of wholesale financing even if JWI had borrowed additional moneys and, therefore, JWI and Mr. Stepp were not harmed by its actions. Stepp disputes this argument and has provided conflicting testimony as to what was expected with respect to the capital loan application, and the security agreement and assignment. Therefore, FMCC's motion for summary judgment as to the Fourteenth cause of action is denied. For the same reasons, the Fifteenth and Sixteenth causes of action, for misrepresentation and negligent misrepresentation in regard to the security agreement, may not be dismissed.

■■■ FMCC has also moved for summary judgment on plaintiff's Seventeenth cause of action alleging economic duress. The Seventeenth cause of action argues that FMCC's actions in threatening to suspend their wholesale financing constituted economic duress in that they forced JWI to give over more of its retail paper to FMCC. The complaint also implies that economic duress occurred when FMCC required additional monies to be put into JWI based on the threat of the withdrawal of wholesale financing. Although the criteria to be used in determining duress is a matter of law, the question of whether duress existed is a matter of fact. *Wurtz v. Fleischman,* 97 Wis.2d 100, 108, 293 N.W.2d 155 (1980). The elements of economic duress to be considered by a trial court are (1) whether the party alleging economic duress can show that he is the victim of a wrongful or unlawful act or threat; (2) the act or threat must deprive the victim of his free will; (3) as a result of the lack of unfettered will and the act or threat, the party must be compelled to make a disproportionate exchange of values or to give up something for nothing; and (4) the party threatened must have no adequate legal remedy. *Id.* at 109–110, 293 N.W.2d 155. Stepp has alleged wrongful acts in his complaint, and has offered proof of them in affidavits. The issue of lack or presence of unfettered will is fundamentally a question of intent; this question is inappropriate for determination on summary judgment. At the time the alleged duress occurred it does appear indeed that no adequate legal remedy was available; and finally, it is possible that the alleged payment or exchange were not made with hope of obtaining a gain, but rather were made to protect JWI. Therefore, the claim for economic duress may not be dismissed on summary judgment.

■■■ FMCC has also moved for summary judgment on Stepp's Nineteenth and Twentieth causes of action, for conversion and slander of title in the wrongful filing of the security agreement. FMCC argues that these causes of action must be dismissed because no damages were suffered

as a result of these actions. This, like the breach of contract claim alleged in the Twenty-fourth cause of action, is subject to a dispute of material fact. Stepp has argued that FMCC's actions in filing the security agreement were wrongful and contributed to the ultimate loss of JWI. The Nineteenth and Twentieth causes of action may not be dismissed.

The Twenty-first cause of action alleges a tortious interference with prospective contractual relations between JWI, Stepp, and Mueller, a prospective buyer of JWI. The damage alleged from the tortious interference is that Stepp lost his position as Business Manager of JWI, which he would have retained had Mueller bought the outfit. A claim for tortious interference requires that defendant's acts be wrongful or unprivileged. *Restatement, Torts (Second)*, §§ 766B, 767. Stepp has argued that FMCC's acts were wrongful based on their intent. This raises a disputed question of fact which may not be resolved on summary judgment. A tortious interference claim must also show that consummation of the prospective contract was reasonably probable. Mueller testified in deposition that he was extremely discouraged from buying JWI because of statements made by FMCC representatives, and their refusal to extend any credit to JWI. Mueller felt that it was not worthwhile to attempt to turn a dealership around when FMCC was unwilling to take any risks. He also testified that he was very surprised at the reluctance to aid a large and formerly successful dealership. Mueller's testimony raises a genuine issue of material fact as to whether the consummation of the contract was reasonably probable.

Finally, Stepp's complaint alleges a breach of the wholesale security and financing agreement. Stepp alleges a breach, not of a specific provision, but rather of the duty of good faith and fair dealing inherent in every contract. FMCC first argues that this duty of good faith and fair dealing does not exist because the original contract was signed in 1964. Subsequent resignings of the contract bring it within current law. It is clear that there is a duty of good faith and fair dealing inherent in every contract in the State of Wisconsin. *Amoco Oil v. Cardinal Oil Co., Inc.*, 535 F.Supp. 661, 666 (E.D.Wis.1982). Although the wholesale financing and security agreement does provide that FMCC can decide whether or not to make loans, if FMCC failed to make further loans for the wrong reason, i.e. in bad faith, there was a breach of the duty of good faith and fair dealing. Stepp has raised a genuine issue of material fact in regard to this cause of action and, therefore, it may not be dismissed.

IT IS THEREFORE ORDERED that:

Defendant's motion for summary judgment is granted as to Stepp's Third, Fifth, Sixth, and Thirteenth claims for relief, and these claims are hereby DISMISSED.

FMCC's motion is DENIED as to Stepp's Fourth, Seventh, Ninth, Eleventh, Twelfth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Nineteenth, Twentieth, Twenty-first, and Twenty-fourth claims for relief.

A status conference is scheduled for January 28, 1986, at 8:30 a.m., at which I expect to set a date for trial. The parties should give some thought as to whether or not the release issue (see my decision of June 18, 1981) should be tried before any of the other claims are presented.