

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-27-1998

# Crossroads v. Orange & Rockland

Precedential or Non-Precedential:

Docket 97-5470

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Crossroads v. Orange & Rockland" (1998). *1998 Decisions.* Paper 252.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/252

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 27, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 97-5470

CROSSROADS COGENERATION CORPORATION

Appellant

v.

ORANGE & ROCKLAND UTILITIES, INC.

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 96-cv-05287)

Argued April 23, 1998

BEFORE: STAPLETON and NYGAARD, Circuit Judges,
and SCHWARTZ,* District Judge

(Opinion Filed October 27, 1998)

William Harla (Argued)
DeCotiis, FitzPatrick & Gluck
500 Frank W. Burr Boulevard
Glenpointe Centre West
Teaneck, NJ 07666
 Attorney for Appellant

_____

* Hon. Murray M. Schwartz, Senior United States District Judge for the
District of Delaware, sitting by designation.

            Glen R. Stuart (Argued)
            Morgan, Lewis & Bockius
            2000 One Logan Square
            Philadelphia, PA 19103
             Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal is from the dismissal of all counts of a complaint filed by Crossroads Cogeneration Corporation ("Crossroads") against Orange and Rockland Utilities, Inc. ("O&R"). The district court dismissed Crossroads' breach of contract claim and related claims on the ground that they were barred by issue and claim preclusion, and dismissed Crossroads' antitrust claims for failure to state a claim upon which relief could be granted. We will reverse in part and affirm in part.

I.

Crossroads, a Delaware company, is an independent producer of electric power that owns and operates a cogeneration facility in Mahwah, New Jersey, its principal place of business. O&R is a New York corporation that operates as a public utility in four counties in New York, New Jersey, and Pennsylvania. In each county in which O&R operates, it is virtually the sole retail provider of electric power to residential, commercial, and industrial customers. Most of the energy O&R provides to customers is purchased from relatively small, independent generators of energy, such as Crossroads. This dispute arises from a power purchase agreement governing the sale to O&R of electricity generated by Crossroads. Before examining the dispute in any detail, however, it is first necessary to review the regulatory context of the agreement.

A.

Under the Federal Power Act, 16 U.S.C. S 791a et seq., the Federal Energy Regulatory Commission ("FERC") is

2

responsible for regulating "public utilities" that offer electric power in interstate commerce. In the midst of a national energy crisis in 1978, Congress modified the Federal Power Act by enacting the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. S 823a et seq. Congress' overall strategy was to "control power generation costs and ensure long-term economic growth by reducing the nation's reliance on oil and gas and increasing the use of more abundant, domestically produced fuels." Freehold Cogeneration Associates, L.P. v. Board of Regulatory Comm'rs of New Jersey, 44 F.3d 1178, 1182 (3d Cir. 1995). One chosen means to this broad end was to encourage the development of cogeneration facilities, which produce both electric and thermal energy from a single fuel source.

Developing a market for cogeneration facilities required overcoming both the reluctance of traditional electric utilities to purchase power from independent providers and the financial burden of state and federal regulation on nontraditional facilities. See FERC v. Mississippi, 456 U.S. 742, 750-51 (1982). To address the first barrier, PURPA creates incentives by requiring FERC to prescribe "such rules as it determines necessary to encourage cogeneration and small power production," including rules to "require electric utilities to offer to . . . purchase electric energy from [cogeneration] facilities." 16 U.S.C. S 824a-3(a). At the same time, to address the burden of regulation, PURPA requires FERC to prescribe rules to exempt small production facilities from many provisions of the Federal Power Act and "from State laws and regulations respecting the rates, or respecting the financial or organizational regulation, of electric utilities." 16 U.S.C. S 824a-3(e).

Acting pursuant to its authority under PURPA, FERC has promulgated regulations governing transactions between cogeneration facilities and electric utilities, including provisions requiring electric utilities to purchase energy from qualifying facilities ("QFs") at a rate up to the utility's full avoided cost.1 In addition, FERC has also promulgated regulations exempting QFs from state regulatory

---

1. In order to qualify as a QF, a cogeneration facility must meet requirements established by FERC. See 18 C.F.R. S 292.101 et seq.

3

requirements. Those regulations provide, in relevant part, that:

> Any qualifying facility shall be exempted . . . from State law or regulation respecting:
>
> (i) The rates of electric utilities; and
>
> (ii) The financial and organizational regulation of electric utilities.

18 C.F.R. S 292.602(c)(1).

Despite the existence of FERC regulations governing QFs and the exemption of QFs from certain federal and state regulations applicable to traditional electric utilities, state regulatory authorities are required to implement FERC rules. See 16 U.S.C. S 824a-3(f). Thus state agencies are actively involved in the formation and performance of contracts between traditional utilities and QFs; in particular, state authorities must review and approve power purchase agreements before they take effect.

B.

In October 1987, O&R entered into a contract with a QF for the purchase of electric energy for a period of twenty years. In 1990, Crossroads purchased the QF 's facility and it assigned the agreement to Crossroads.[2] Pursuant to FERC regulations, the agreement required approval by the New York Public Service Commission ("NYPSC"), the state agency responsible for regulating electric utilities. After several changes were made at the NYPSC's request, the required approval was granted in December of 1988. The agreement provided that Crossroads' predecessor would supply energy to O&R from a cogeneration facility that "initially will be designed to generate nominally 3.3 MW of capacity and to generate approximately 26,300 MWH of electric energy annually." App. at 65. The facility was initially constructed with three combustion engines, each of which had a generating capacity of approximately 1.1 MW. However, the agreement anticipated that the plant might

_____

2. It is undisputed that Crossroads is a "qualifying facility."

4

eventually grow in size, and the parties accordingly agreed upon the disposition of any capacity in excess of 3.3 MW:

> [Crossroads] shall deliver and sell to [O&R] and [O&R] shall accept and purchase from [Crossroads], subject to the terms and conditions of this agreement, all the capacity produced by the Plant, up to a maximum of 4 MW, and all energy associated with such capacity, net of that capacity and energy used from time to time to operate the Plant. No change in the amount of capacity committed hereunder shall be permitted without the written consent of [O&R] and [Crossroads]. [Crossroads] shall have the right to sell to third parties or make alternate dispositions of all the capacity produced by the Plant in excess of 4 MW and all energy associated with such excess capacity; provided, however, that [O&R] shall have a right offirst refusal to purchase such excess capacity and energy for the price set forth herein.

App. at 70.

Thus, despite the 3.3 MW initial capacity, the agreement (1) requires O&R to purchase at the contract price all energy produced up to 4 MW; (2) reserves to O&R a right of first refusal in allocating any energy in excess of 4 MW; and (3) provides that Crossroads may sell on the open market any energy above 4 MW that O&R refuses.

This dispute arose in May 1996, when Crossroads constructed and began operating a new gas turbine at the facility, capable of generating 5 MW of power. O&R refused to pay the contract price for energy generated by the new turbine, while Crossroads claimed that O&R was obligated under the agreement to purchase all energy generated by the original or new equipment up to a capacity of 4 MW. O&R filed a petition with the NYPSC asking for a declaratory ruling that it was not obligated to"purchase energy produced by the [new] Turbine at the prices set forth in the Agreement." App. at 63. Though acknowledging that the terms of the agreement required it to purchase "all the capacity produced by the Plant up to a maximum of 4 MW," App. at 57, O&R argued that it would nonetheless be unfair to require it to purchase energy from the new turbine.

5

O&R's petition contended that the rates set forth in the agreement are substantially higher than the market would bear today, a result of policies in the 1980s that provided subsidies to cogeneration facilities. Since the plant's capacity was 3.3 before addition of the new turbine, O&R had not been paying for the full 4 MW of energy prior to addition of the new turbine. With the new turbine, Crossroads would easily fulfill the 4 MW that O&R was obliged to purchase under the agreement. Because O&R is locked into what it perceives is above-market rates, it charged that Crossroads was "seek[ing] to circumvent the terms and spirit of the Agreement by supplementing the availability of the Original Generators with the output from the Turbine." App. at 61. O&R estimated that it would be required to pay an additional $4.2 million to Crossroads for the additional energy over the life of the contract, concluding that "[r]equiring [its] ratepayers to subsidize Crossroads [was] simply inappropriate." App. at 61.

Crossroads opposed O&R's petition before the NYPSC. Citing a decision of this Circuit, Freehold Cogeneration Associates v. Board of Regulatory Comm'rs of New Jersey, 44 F.3d 1178 (3d Cir. 1995), Crossroads argued that once a state utility commission approves the terms of a power purchase agreement, "any action . . . to reconsider its approval" is preempted by PURPA. 44 F.3d at 1194. Crossroads also cited NYPSC precedent suggesting that the agency usually refused to get involved in contract disputes between utilities and their suppliers. Finally, Crossroads contended that the issue was more complex than O&R's petition made it out to be, and requested an opportunity to supplement the record should the Commission decide to exercise jurisdiction.

The NYPSC granted O&R's petition. The Commission determined that it had authority to review the petition because of its power to "interpret [its] power purchase contract approvals." App. at 172. The NYPSC found that O&R's petition could be read as a request for it to explain and interpret whether the earlier approval of the contract included the additional capacity created by the new turbine. The Commission concluded that "[u]nder the approval . . . Crossroads may not supplement electricity

6

produced by its [original] engine capacity with electricity produced from its new turbine capacity." App. at 173. Thus, the Commission ordered that electricity generated by the new turbine could not be priced at the contract rate.

Crossroads then filed this action, seeking recovery for breach of contract and antitrust violations.3 O&R moved to dismiss Crossroads' claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Crossroads cross-moved for summary judgment on all claims. The district court granted O&R's motion and denied Crossroads' motion. The district court determined that: (1) the contract claims4 all are "premised on [Crossroads'] contention that[O&R] breached its obligations under the terms of the Agreement by refusing to pay the contract price for energy generated by the new gas turbine," Op. at 15; (2) Crossroads is barred by principles of issue and claim preclusion from litigating the issue of whether the agreement requires purchase of energy from the new turbine because that issue was litigated and determined before the NYPSC; (3) Crossroads' argument that the NYPSC did not have jurisdiction to construe the contract is also barred by operation of the "jurisdictional finality" rule of issue preclusion; and (4) Crossroads failed to sufficiently allege antitrust violations. After dismissing all Crossroads' claims, the district court then denied its cross-motion for summary judgment as moot. This appeal followed.5

II.

We will reverse the judgment of the district court with respect to Crossroads' contract claims.

_____

3. Crossroads has preserved its right to appeal the NYPSC's determination by filing an appeal in the appropriate New York state court. The parties have by stipulation stayed that proceeding pending the outcome of this case.

4. The claims involved are Crossroads' First, Second, Third, and Fourth causes of action, for breach of contract, breach of the covenant of good faith and fair dealing, anticipatory repudiation, and declaratory judgment.

5. The district court had jurisdiction pursuant to 28 U.S.C. SS 1332 & 1337. We have jurisdiction from the district court'sfinal order pursuant to 28 U.S.C. S 1291.

7

A.

Issue preclusion, also known as collateral estoppel, bars relitigation of issues adjudicated in a prior action. Federal courts are required to give preclusive effect to state court judgments by virtue of the Full Faith and Credit Act, which provides that "Acts, records and judicial proceedings . . . shall have the same full faith and credit in every [federal] court . . . as they have by law or usage in the courts of such State . . . from where they are taken." 28 U.S.C. S 1738; see Swineford v. Snyder County, 15 F.3d 1258, 1266 (3d Cir. 1994). By its terms, S 1738 applies only to state court decisions, and the Supreme Court has determined that the statute does not apply to administrative agency decisions that have not beenfirst reviewed by a state court. See University of Tennessee v. Elliott, 478 U.S. 788, 794 (1986). However, the Court has "frequently fashioned federal common-law rules of preclusion in the absence of a governing statute." Id. Thus, we must determine whether an unreviewed decision of the NYPSC should be given preclusive effect.

Though the Supreme Court has not yet addressed the preclusive effect of decisions of state agencies responsible for utility regulation, we are guided by several generally applicable criteria. The Court has determined that, unless a federal statute specifically indicates that state agency decisions should not be considered conclusive, as in the context of Title VII, Elliott, 478 U.S. at 795-96, and the Age Discrimination Act, Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110-11 (1991), factualfindings of state agencies should be given the same preclusive effect they would be accorded in the courts of that state. See Elliott, 478 U.S. at 797; Edmundson v. Borough of Kennett Square, 4 F.3d 186, 192 (3d Cir. 1993). In addition, applying preclusive effect to legal conclusions made by state agencies "is favored as a matter of general policy, [though] its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures." Astoria, 501 U.S. at 109-10.

In this case, we determine that the factual findings and legal conclusions of the NYPSC should be given preclusive

effect to the extent afforded under New York law. Unlike Astoria or Elliott, we find no provision of PURPA that seeks to limit common law rules of preclusion from applying to state agency decisions relating to utility regulation. Though PURPA does limit the authority of state agencies in some respects, e.g., by exempting cogeneration facilities from some regulation, PURPA still provides a substantial role to state agencies in regulating energy contracts between utilities and cogenerators. Indeed, state agencies are specifically required by federal law to implement FERC regulations. Given the substantial role given state utility agencies by Congress in enacting PURPA, we conclude Congress did not intend to prevent application of common law rules of preclusion. Thus, we will give preclusive effect to the NYPSC decision to the same extent as would the New York courts. Accord Long Island Lighting Co. v. IMO Industries, Inc., 6 F.3d 876, 885 (2d Cir. 1993) (decision of NYPSC given preclusive effect).

Crossroads also contends that, in particular, the NYPSC's determination that it had jurisdiction over O&R's petition should not be given preclusive effect in this action. Though recognizing that, generally speaking, a tribunal's determination of its own jurisdiction is accorded the same status for issue preclusion purposes as the merits of a dispute, see Durfee v. Duke, 375 U.S. 106, 114 (1963), Crossroads contends an exception to the rule applies in a case like this where a federal statute, PURPA, preempts the state agency from acting altogether. This more limited argument of Crossroads presents, in our judgment, a close question. We conclude that we need not resolve it, however, in light of our determination in subsection C below that the NYPSC decided an issue distinct from that to be decided in this case, and our determination in subsection D below that Crossroads' contract claims are not barred by claim preclusion. Accordingly, we assume, without deciding, that the Commission had the jurisdiction it purported to exercise with respect to O&R's petition.

B.

Under New York law, an issue adjudicated in a prior proceeding will have preclusive effect where (1) the "issue in

9

the present proceeding [is] identical to that necessarily decided in a prior proceeding" and (2) "in the prior proceeding the party against whom preclusion is sought was accorded a full and fair opportunity to contest the issue." Allied Chemical v. Niagara Mohawk Power Corp., 528 N.E.2d 153, 155 (N.Y. 1988).6 The district court, after examining the NYPSC decision, determined that these requirements were met and concluded that Crossroads' claims were precluded by the prior determination. See Op. at 19. On appeal, Crossroads challenges the determination that they were provided a "full and fair" opportunity to litigate before the NYPSC. See Appellant's Br. at 26, 33–35.

Under New York law:

> A determination whether the first action or proceeding genuinely provided a full and fair opportunity requires consideration of "the `realities of the [prior] litigation', including the context and other circumstances which . . . may have had the practical effect of discouraging or deterring a party from fully litigating the determination which is now asserted against him". (People v. Plevy, 52 N.Y.2d 58, 65, 436 N.Y.S.2d 224, 417 N.E.2d 518.) Among the specific factors to be considered are the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, the competence and expertise of counsel, the availability of new evidence, the differences in the applicable law and the foreseeability of future litigation. (Gilberg v. Barbieri, 53 N.Y.2d 285, 292, 441 N.Y.S.2d 49, 423 N.E.2d 807; Schwartz v. Public Administrator, 24 N.Y.2d 65, 72, 298 N.Y.S.2d 955, 246 N.E.2d 725.)

_____

6. In addition, when applying issue preclusion to an administrative agency, New York courts are required to ascertain that the agency proceeding was "quasi-judicial" in nature; i.e., whether (1) the agency has the power to act adjudicatively, (2) the agency follows adequate fact-finding procedures, (3) the issue was fully aired, and (4) the parties expect to be bound by the decision. See Allied, 528 N.E.2d at 155. In Allied, New York's highest court determined that, judged by these criteria, a decision of the NYPSC was "quasi-judicial." The district court in this case agreed, and Crossroads provides no persuasive reason on appeal to conclude differently.

10

Ryan v. New York Telephone Co., 467 N.E.2d 487, 491 (N.Y. 1984). These requirements are intended to make certain that the first tribunal carefully considered the issues litigated, and that the party against whom preclusion is sought had a chance to offer vigorous argument for its position. In this case, two issues of "full and fair" opportunity arise from the litigation before the NYPSC: (1) whether Crossroads was given a "full and fair" chance to argue the issue of the NYPSC's jurisdiction to address O&R's petition; and (2) whether Crossroads was given a "full and fair" opportunity to litigate the merits of the petition.

The issue of whether Crossroads had a "full and fair" opportunity to argue, before the NYPSC, the issue of the NYPSC's own jurisdiction is straightforward. The parties both submitted briefs before the NYPSC outlining their view of the jurisdictional issue, including Crossroads' contentions that PURPA, FERC regulations, and the NYPSC's own practice prohibited jurisdiction over the interpretation of the contract. Crossroads' brief before the NYPSC mirrors the arguments made before us on appeal. The NYPSC opinion deciding the issue carefully considered each of Crossroads' arguments and reflects a considered analysis of its jurisdictional predicate. Reading the parties' submissions before the NYPSC, and the resulting decision, we believe, leads to the conclusion that Crossroads had a full and fair opportunity to litigate the issue of the agency's jurisdiction.

The more debatable issue is whether Crossroads had a full and fair opportunity to litigate the merits of O&R's petition. In addition to determining that it had jurisdiction over O&R's petition, the NYPSC also proceeded to grant the petition, holding that "[u]nder [its] approval of the contract for the Crossroads site, [Crossroads] may not expand the generation production entitled to the contract pricing. . . . As a result, the expanded production made possible by Crossroads' new turbine is beyond the terms and conditions approved for this contract." App. at 173.

In this appeal, Crossroads briefly argues that the NYPSC's consideration of the merits of O&R's petition did not offer Crossroads a "full and fair" opportunity to contest

11

the issue. Crossroads contends that it did not seek relief from the NYPSC or participate voluntarily in the agency's proceedings, that it solely contested the jurisdictional issue, and that it requested, and was denied, an opportunity to supplement the record before the NYPSC. Despite these arguments, we believe that Crossroads had a full and fair opportunity to litigate the merits of O&R's petition for declaratory relief before the NYPSC.

Crossroads' argument that it did not seek relief before the NYPSC and did not voluntarily participate before the agency is not legally relevant to whether it had a full and fair opportunity to litigate the merits issue. Moreover, contrary to its assertion in its brief, Crossroads' submission before the NYPSC did argue the merits of the petition. Crossroads contended that the agreement could not be read to suggest that the original set of three 1.1 MW generators was the only capacity assumed by the parties, pointing to language in the agreement and exhibits demonstrating the intent of the parties at the time the contract was signed. That these arguments were not accepted by the NYPSC does not mean that Crossroads had an inadequate opportunity to present them.

Crossroads also argues that the NYPSC did not heed its request to file additional materials before it rendered its decision on the merits of the petition. In its submission to the agency, Crossroads requested that "[s]hould the Commission determine that it will entertain O&R's request for a declaratory ruling, CROSSROADS respectively reserves its right to make a further submission that more fully describes the matters in dispute . . . ." App. at 120. However, the fact that Crossroads asked for a second opportunity to argue the issue does not establish that it did not have a "full and fair" first opportunity. Moreover, Crossroads has not pointed to any additional materials or arguments that it would have made before the NYPSC. Since Crossroads has not suggested that it would have made any additional arguments before the NYPSC, it is difficult to conclude that it did not have a full and fair opportunity to litigate on this ground.

More importantly, looking only to Crossroads' opportunity to litigate before the NYPSC is not the legally relevant

12

perspective. The issue of a "full and fair" opportunity to litigate includes the possibility of a chain of appellate review. See, e.g., Kremer v. Chemical Construction Corp., 456 U.S. 461, 484 (1982); Reubens v. New York City Dep't of Juvenile Justice, 930 F. Supp. 887, 892 (S.D.N.Y. 1996). Crossroads has an opportunity to appeal the NYPSC's decision through the state court system, and Crossroads will presumably have an opportunity in those proceedings to raise its claims regarding the merits of O&R's petition, as well as its contention that the NYPSC improperly denied its application to supplement the record. In short, in determining whether a litigant has been given a "full and fair" opportunity to litigate a claim, we must take into account the possibility of appellate review. Since such review is available in this case, and there is no allegation that it would be inadequate to consider Crossroads' arguments,7 Crossroads has been given a full and fair opportunity for preclusion purposes.

C.

In addition to the requirement of an opportunity to argue the merits, issue preclusion applies only when the issue in the present proceeding is "identical" to that decided in the prior proceeding. Allied, 528 N.E.2d at 155. Thus, application of claim preclusion is appropriate here only if it can be said that the issue decided by the NYPSC is the same issue that Crossroads, by filing its contract claims, has asked the district court to decide. Resolution of this issue requires that we examine with some care the law applicable to those claims and the specific grounds upon which the NYPSC rested its decision on the jurisdictional and merits issues.

As we noted above, under PURPA and the regulations
_____

7. At oral argument Crossroads suggested that a restrictive standard of review in the New York state courts might limit its ability to litigate its
position. However, these comments were not raised before oral argument. Moreover, we find no reason to believe that the standard of review applied by an appellate court would impair the ability of Crossroads to meaningfully make the arguments it has advanced before us.

13

adopted by the FERC, qualifying facilities like Crossroads are exempt from state utility-type regulation, including regulation of "rates of electric utilities." 18 C.F.R. S 292.602(c)(1). We have interpreted these regulations to prevent state regulatory commissions from modifying the terms of a power purchase agreement between a utility and cogeneration facility after it has been approved by the state. In other words, while PURPA allows the appropriate state regulatory agency to approve a power purchasing agreement, once such an agreement is approved, the state agency is not permitted to modify the terms of the agreement. To do so would be to engage in the utility-type regulation from which PURPA exempts QFs.

This principle was recently articulated in Freehold Cogeneration Associates, L.P. v. Board of Regulatory Comm'rs of New Jersey, 44 F.3d 1178 (3d Cir. 1995). Freehold involved facts similar to those before us. A utility and cogenerator reached a twenty-year power purchase agreement at certain specified rates. The agreement was approved by the New Jersey regulatory board responsible for reviewing such agreements. After a year had passed under the contract, the utility, in response to lower costs for obtaining electrical power, notified the state board that it wished to modify the pricing structure of the agreement. The cogenerator rejected suggestions to renegotiate or agree to a buy-out offer to end the contract. The regulatory board then directed the cogenerator to renegotiate the rates under the agreement or agree to a buy-out. The cogeneratorfiled a complaint in the district court, seeking a declaratory judgment exempting it from the board's attempts to modify the agreement. The district court denied relief. On appeal, after determining jurisdiction, ripeness, and other challenges, we proceeded to discuss whether PURPA preempted the state regulatory board's order requiring renegotiation of the agreement.

Noting that "PURPA and the implementing regulations establish an extensive federal system to encourage and regulate the sale of electrical energy by QFs," we determined that FERC, and not state regulatory agencies, were responsible for establishing the parameters governing power purchase agreements between utilities and qualifying

14

facilities. 44 F.3d at 1191. Though FERC did allow state agencies to approve such agreements, the implementation authority of state agencies end once an agreement is approved. After approval has been granted, "attempt[s] to either modify the [agreement] or revoke [state agency] approval is `utility-type' regulation -- exactly the type of regulation from which [a qualifying facility] is immune under [PURPA]." Id. at 1192. Thus, unless the qualifying authority waives its PURPA rights in the agreement, the federal law prevents the state from "reconsideration of its prior approval." Id.

Not surprisingly, Crossroads cited our Freehold decision to the NYPSC in support of its contention that the Commission lacked jurisdiction to interpret the power purchase agreement. In response, the NYPSC expressly recognized the "contract non-interference policy" inherent in PURPA and acknowledged that it lacked jurisdiction to interpret the agreement. It carefully drew a distinction, however, between interpreting the agreement between the parties and interpreting its approval of that agreement, holding that it possessed jurisdiction to do the latter:

> As was recently reaffirmed, it is within our authority to interpret our power purchase contract approvals, and that jurisdiction has been upheld by the courts. The precedents involving interpretation of past policies and approvals, and not the contract non-interference policy that Crossroads cites, control here. As a result, the approval of the original contract for the Crossroads site may be explained and interpreted, and O&R's petition may be construed as requesting that relief. That approval was limited to a project consisting of three reciprocating engines, sized at a net capacity of 3.3 MW, with an estimated annual electrical output of 26,300 MWh. Under the approval, therefore, Crossroads may not supplement electricity produced by its reciprocating engine capacity with electricity produced from its new turbine capacity.

App. at 172-73 (footnotes omitted) (emphasis supplied).

The opinion of the NYPSC is devoid of any reference to the text of the agreement. In reaching its conclusion that its

15

"approval was limited to a project consisting of three reciprocating engines, sized at a net capacity of 3.3 MW," the Commission cites solely to a memorandum from its staff that describes the then existing cogeneration plant as "consist[ing] of three dual fuel engine-generator sets." App. at 137, 173. Consistent with its ruling on jurisdiction, the Commission's holding was carefully circumscribed to reflect only an interpretation of its approval:

> Accordingly, we find and declare that the petition of Orange and Rockland Utilities, Inc. is granted in part, to the extent that the December 2, 1988 approval of Contract No. E-139 between O&R and Onsite (Crossroads' predecessor) is construed as limiting the contract pricing to electric production from the three reciprocating engine facility that was installed in 1987, and does not extend to production from the gas-fired turbine that was installed in 1996.

App. at 174. The referenced "December 2, 1988 approval" is a Commission letter to the parties informing them that it had "accepted the contract and supplement" thereto "contingent upon . . . the contract being amended" in two detailed respects not relevant here. Neither side maintains before us that the required amendments were not made.

It is thus apparent that the NYPSC, because of the limitations it perceived on its own jurisdiction, deliberately excluded from its deliberation any interpretation of the contract it approved on December 2, 1988. As a result, we conclude that it did not decide the issue presented by the contract claim in this case.

As we understand the federal law applicable here, although a PURPA-governed agreement is unenforceable prior to approval by the relevant state agency, the rights of the parties, once their agreement receives such approval, are to be determined by applying normal principles of contract interpretation to their agreement. Thus, the district court in this case is being asked to determine from the approved agreement of the parties their intention with respect to O&R duty to purchase new capacity. This is an issue that the NYPSC expressly declined to address.

16

We do not suggest that a court asked to enforce a state approved PURPA governed agreement will never have occasion to consider the terms of the agency's approval. In some cases, those terms may be highly relevant in determining the parties' understanding of their respective rights and duties under the contract. Nothing in the approval granted here is helpful in that respect, however. Moreover, when those terms have relevance, they are relevant only in the context of the understanding of the parties as reflected in an objective reading of the agreement and its approval. An inquiry into the issues focused on by the Commission and its staff as reflected in its internal records is not relevant.

Accordingly, we conclude that the issue decided by the NYPSC does not have preclusive effect with respect to the issues presented by Crossroads' contract claims.

D.

In addition to issue preclusion, the district court also determined that Crossroads' contract claims were barred by claim preclusion. Operation of claim preclusion, or res judicata, enforces the principle that a final judgment of a claim on the merits between the same parties resolves both that claim and all others arising out of the same transaction. See Ryan v. New York Telephone Co., 467 N.E.2d 487, 489–90 (N.Y. 1984). Applying this doctrine, the district court concluded that Crossroads' contract claims "were already litigated between these parties before the NYPSC, which reached a final determination of those claims on the merits." Op. at 18. We disagree.

New York courts have adopted a "transactional" approach to res judicata, meaning that "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." O'Brien v. City of Syracuse, 429 N.E.2d 1158, 1159 (N.Y. 1981); see also Schuylkill Fuel Corp. v. B. & C. Nieberg Realty Corp., 165 N.E. 456, 457 (N.Y. 1929) (Cardozo, C.J.) ("A judgment in one action is conclusive in a later one, not only as to any matters actually litigated

17

therein, but also as to any that might have been so litigated . . . ."). This principle has been applied by New York courts in cases where a defense or counterclaim used in one action is asserted in a later action. See, e.g. , Board of Managers of Windridge Condominiums One v. Horn, 651 N.Y.S.2d 326 (N.Y. App. Div. 1996); Lippman v. Lippman, 612 N.Y.S.2d 532 (N.Y. App. Div. 1994). Thus, if O&R had brought its declaratory judgment action in a New York court of general jurisdiction, rather than the NYPSC, asking for a declaration that it had no duty to buy additional power under the agreement, Crossroads would have to come forward with any and all grounds it might have to assert that this duty exists. If so, then under traditional claim preclusion principles Crossroads would be bound by an adverse declaratory judgment whether or not the court expressly ruled on the meaning of the contract.

Nevertheless, we predict that New York courts would not apply claim preclusion in the circumstances now before us. Crossroads was taken involuntarily before the NYPSC, and it asserted a jurisdictional argument there. The Commission, as we have read its opinion above, accepted that defense to the extent that O&R was asking for a contract interpretation. It went out of its way to hold that it was without jurisdiction to grant such relief but that it did have jurisdiction to interpret its approval. Accordingly, we think this is a situation of the kind described in the Restatement (Second) of Judgments:

> S 26. Exceptions to the General Rule Concern ing Splitting
>
> (1) When any of the following circumstances exists, the general rule of S 24 does not apply to extinguish the claim, and part or all of the claim subsists as a possible basis for a second action by the plaintiff against the defendant: . . .
>
>  (c) The plaintiff was unable to rely on a cert ain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on the subject matter jurisdiction of the courts or restrictions on their authority to entertain multiple theories or demands for multiple remedies or forms of

18

relief in a single action, and the plaintiff desires in the second action to rely on that theory or to seek that remedy or form of relief . . . .

New York courts, applying this provision, have created an exception to claim preclusion in situations where the first tribunal lacks jurisdiction to offer the relief sought in the second proceeding. Compare Handy v. Westbury Teachers Ass'n, 104 A.D.2d 923, 925–26 (N.Y. App. Div. 1984) (state agency that "declined to adjudicate [plaintiffs] contentions on these issues . . . holding that it lacked . . . jurisdiction leaves plaintiffs free to raise those same contentions in [later] action") with Pauk v. Board of Trustees of the City Univ. of N.Y., 111 A.D.2d 17, 21 (N.Y. App. Div. 1985) (res judicata applies where grounds for recovery "was entirely available to plaintiff as a basis for relief " in the prior proceeding). Because the contract claims were unavailable to Crossroads before the NYPSC, we hold that claim preclusion was improperly applied in this case.

E.

In reaching the conclusion that the district court is free to decide Crossroads' contract claims on their merits, we are mindful of the fact that the NYPSC's opinion ultimately declared that O&R owes no duty to purchase at the contract rate energy generated by Crossroads in excess of 3.3 MW but less than 4 MW. This can be, and in most circumstances would properly be, viewed as a declaration on the same issue presented to the district court by Crossroads' contract claims. Had the Commission regarded itself as having jurisdiction to consider the terms of the contract, the district court would clearly be barred from proceeding on the contract claims by both issue and claim preclusion. But the Commission's opinion makes it indisputably clear that it drew a careful distinction between interpreting the intent of the parties as reflected in their approved agreement and interpreting the intent of the Commission and then concluded that it had no jurisdiction to do the former. Given that Crossroads' contract claims rest solely on the intent of the parties as reflected in the contract, we can remain faithful to the principles underlying S 26 of the Restatement and the New York cases

19

embracing it only by looking beneath the Commission's ultimate conclusion to its foundation., i.e., its determination that in 1988 it had considered and subjectively approved only the sale of energy from the existing facilities at the contract price. Because the Commission considered itself without jurisdiction to consider the argument that Crossroads was making, Crossroads remains entitled to its day in the district court.

III.

In its fifth cause of action, Crossroads accuses O&R of monopolization and attempted monopolization, in violation of S 2 of the Sherman Act, 15 U.S.C. S 2, and price discrimination, in violation of S 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. S 13. Crossroads alleges that O&R's refusal to purchase energy from Crossroads pursuant to the agreement has helped unfairly solidify O&R's monopoly position in its service area. In addition, Crossroads alleges that O&R has impeded its attempts to sell its excess energy to customers in O&R's service area by offering those customers lower prices. The district court dismissed Crossroads cause of action on both theories for failure to state a claim. On appeal, Crossroads contends that its complaint is sufficient to survive dismissal. We agree with this aspect of the district court's decision.

The district court correctly determined that Crossroads' Sherman Act claims should be dismissed. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony . . . ." 15 U.S.C.S 2. To state a claim for monopolization, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." Schuylkill Energy Resources v. Pennsylvania Power & Light Co., 113 F.3d 405, 412-13 (3d Cir.) (quotations omitted), cert. denied, 118 S. Ct. 435 (1997). To state a claim for attempted monopolization, a

20

plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Schuylkill, 113 F.3d at 413.

The district court determined that Crossroads had failed to allege a relevant market or sufficient monopoly power to state a claim under the Sherman Act. The court held that:

> [P]laintiff fails, as a matter of law, to sufficiently allege monopoly power. Plaintiff merely states that defendant is the sole provider of electricity to certain customers in the counties it services. . . . Plaintiff fails to allege such necessary facts as defendant's market share in the markets in which plaintiff is a competitor or that barriers that exist which prevent plaintiff 's entry into such markets. These deficiencies in the Complaint mandate dismissal of plaintiff 's Sherman Act claims. See Barr Lab, Inc. v. Abbott Lab, 978 F.2d 98, 112-13 (3d Cir. 1992).

Op. at 9. We agree with the district court's reasoning.

Alleging market share alone is not sufficient to state a claim under the Sherman Act. Monopolization or threatened monopolization requires something more, which may include "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." Barr Labs, 978 F.2d at 112. Crossroads has not alleged any of these factors. Nor is it likely that it could have done so. Crossroads admits that it acts as a competitor to O&R in selling its excess capacity in O&R's service area, and it provides no reason why it is prevented from doing so in the future. The complaint simply fails to allege anything to suggest monopolization by O&R cognizable by the Sherman Act.

The district court also did not err in dismissing Crossroads' price discrimination claim under the Robinson-Patman Act. Crossroads alleges that O&R approached its excess capacity customer and offered to sell it electricity at a lower price than that offered by Crossroads, that the reduced price was not offered to all customers, and that such action constitutes a violation of the Robinson-Patman

21

Act. The Robinson–Patman Act, which amended the Clayton Act, prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. S 13(a). In order to state a claim under the Robinson–Patman Act, a plaintiff must allege facts to demonstrate that (1) the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers; and (2) the effect of such discrimination was to injure competition. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219–27 (1993).

The district court dismissed Crossroads' claim because it failed to allege that O&R made any sales of energy at different prices. The complaint merely alleges that O&R has "offered" to sell electricity at a rate lower than that charged by Crossroads. Crossroads does not deny this infirmity, but contends that since O&R is virtually the sole provider of electricity in its service area that there is "danger" that O&R will abuse its market power in competing with smaller suppliers like Crossroads. See Appellant's Br. at 47. This position is not supported by any citation to authority and suggests that Crossroads' claim is based on at a speculative threat of future competitive injury, which would not be ripe for determination in any event. Merely offering lower prices to a customer does not state at a price discrimination claim.8

Even if the offer of lower prices were sufficient to survive dismissal, Crossroads has failed to sufficiently plead the second element of a price discrimination claim: injury to competition. Crossroads has made no allegation of predatory conduct in any offers to customers that O&R has made, nor has it alleged any other competitive effect of O&R's offer. The mere fact of O&R's market share does not mean that approaching Crossroads' customer is an antitrust violation, so something additional must be alleged in order to survive dismissal. See Barr Labs, 978 F.2d at 106–07. Crossroads has not alleged any anticompetitive

_____

8. As the district court noted, at least two other circuits have required dismissal when two sales are not alleged. See Terry's Floor Fashions, Inc. v. Burlington Indus., 763 F.2d 604, 615 (4th Cir. 1985); Fusco v. Xerox Corp., 676 F.2d 332, 337 (8th Cir. 1982).

effect, such as below-market prices, or any other indicia of anticompetitive behavior. Crossroads' monopolization and price discrimination claims simply come up short.

IV.

The judgment of the district court will be reversed, and the matter will be remanded for further proceedings consistent with this opinion.9

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

---

9. As we noted above, the district court denied Crossroads' cross-motion for summary judgment as moot. In light of our decision, the motion is no longer moot, but we decline to reach its merits since it has not been briefed before us nor first addressed by the district court.