CAPITAL TEMPORARIES, INC. OF HARTFORD, et al., Plaintiffs and Appellants,

v.

The OLSTEN CORPORATION, Defendant and Appellee.

No. 68, Docket 74–1077.

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1974.

Decided Oct. 17, 1974.

Ralph C. Dixon, Hartford, Conn. (Day, Berry & Howard, Philip S. Walker, Au- gustus R. Southworth III, Hartford, Conn., on the brief), for plaintiffs-appel- lants.

Irving S. Ribicoff, Hartford, Conn. (Ribicoff & Kotkin, Richard W. Tomc, Hartford, Conn.; Fain & Konover, Mat- thew J. Forstadt, Stamford, Conn., on the brief), for defendant-appellee.

Before MOORE, MULLIGAN and ADAMS*, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a partial sum- mary judgment entered by the District Court for the District of Connecticut, Hon. M. Joseph Blumenfeld, on October 15, 1973, dismissing the fifth count of the plaintiff's amended complaint. 365 F.Supp. 888 (D.Conn.1973). The rul- ing of the district court also denied the plaintiff's cross-motion for summary judgment on the same count, rejecting plaintiff's contention that there was no genuine issue as to any material fact and that the defendant, as a matter of law, had imposed a tie-in, illegal per se under section 1 of the Sherman Act. Thereafter, on October 25, 1973, plain- tiff moved to amend the judgment, pur- suant to 28 U.S.C. § 1292(b), to in- clude a statement that it involved a con- trolling question of law as to which there was a substantial ground for difference of opinion and that an immediate appeal from the order might materially ad- vance the ultimate termination of the litigation. By order dated December 4, the District Court amended the judg- ment to include the necessary statement but did not state what the controlling question of law was.

On December 21st, the plaintiff filed a petition for leave to appeal, setting forth the controlling question of law in these terms:

The question involved in this appeal is whether the plaintiff must establish actual coercion, outside of the agree- ment, to operate the tied business, in order to maintain its antitrust action,

---

* Of the Third Circuit Court of Appeals, sitting by designation.

or is it sufficient to show that the plaintiffs were restricted by the contract imposed by the defendant in operating any blue collar business other than under the HANDY ANDY mark with the payment of franchise fees to the defendant.

On January 9th, 1974, this court granted leave to appeal pursuant to § 1292(b) and rule 5, Fed.R.App.P. On March 22, the plaintiff, in designating the part of the record to be included in the appendix, stated that the question on appeal was whether the district court erred in granting the defendant's motion for summary judgment. Defendant then moved for an order to limit the statement of issues to the controlling question of law presented in plaintiff's petition for leave to appeal; on April 18th, this court granted that motion. On this appeal the plaintiff-appellant's brief raises not only the controlling question of law, but also the propriety of the granting of summary judgment dismissing the fifth count. The defendant has moved to dismiss the appeal on the ground that the issues raised are broader than the question which was specified by the order of this court.

## I THE MOTION TO DISMISS

Before discussing the merits of this appeal, we face the question as to whether or not this court can appropriately consider the argument, now made by plaintiff, that in addition to the question posed as the controlling issue of law, the court below committed error by the granting of summary judgment. Section 1292(b) permits an appeal from an interlocutory order where the order involves "a controlling question of law as to which there is substantial ground for difference of opinion and [where] an immediate appeal from the *order* may materially advance the ultimate termination of the litigation. . . . The Court of Appeals may, . . . in its discretion, permit an appeal to be taken from such *order*. . . ." (emphasis supplied). Once such leave to appeal is granted, the court of appeals "is not re-

stricted to a decision of the question of law which in the district judge's view was controlling." Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. 1974) (*en banc*). Accord, Johnson v. Alldredge, 488 F.2d 820, 822–823 (3d Cir. 1973).

■ Since the appeal therefore places before us the *order* granting partial summary judgment dismissing the fifth count of the complaint, we believe that judicial economy requires that we address ourselves not only to the question posed but also to the propriety of the issuance of the summary judgment. 9 J. Moore, Federal Practice ¶ 110.25 [1], at 273 (2d ed. 1973). See also Hurwitz v. Directors Guild of America, Inc., 364 F.2d 67, 70 (2d Cir.), cert. denied, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). The motion to dismiss the appeal is therefore denied.

## II THE FACTS

Defendant, The Olsten Corporation (Olsten), a Delaware corporation with its principal place of business in New York, is engaged in the business of supplying temporary personnel to customers. It supplies both "white collar" or office personnel under the name and registered trademark of "Olsten," and "blue collar" or non-office workers under the name and registered trademark of "Handy Andy Labor". These services are supplied in many cities throughout the United States and Canada either through Olsten branch offices or through franchises listed by Olsten. In 1965, Constantine T. Zessos, a salesman with no previous personnel-business experience, entered into negotiations with Olsten which culminated in a franchise agreement executed on September 17, 1965. This agreement provided Zessos the exclusive license to use both of defendant's trademarks and names, plus various techniques and systems, in Hartford and Middlesex counties in the State of Connecticut. A rider executed by the parties on the same date also conferred upon Zessos the right to operate a white collar franchise in the County of New

Haven provided it was opened within 18 months after the first billing rendered by the Olsten's Hartford office.

Zessos attended a course provided by Olsten and also received various supplies and forms necessary for the business. Pursuant to the license agreement, Zessos started his white collar operation in Hartford in January, 1966, and a similar operation in New Haven some time thereafter. These were incorporated as Olsten's of Hartford County, Inc. and Olsten's of New Haven County, Inc.; the names were later changed in November, 1971 to Capital Temporaries, Inc. of Hartford and Capital Temporaries, Inc. of New Haven. These latter corporations are presently plaintiffs in this action together with Zessos.

No blue collar operation was commenced by Zessos in Hartford, but in 1968 and 1969 he negotiated an amendment to the initial agreement. The amendment, executed on August 23, 1969, extended Zessos's time to open a Handy Andy office in Hartford and New Haven to December 31, 1969. In September, 1969, he did open a Handy Andy office in New Haven, which remained in operation until June, 1971.

■ On November 1, 1971, Zessos repudiated the franchise agreement and acrimonious litigation ensued. Olsten sued Zessos in the Connecticut Superior Court to enforce the agreement and to recover franchise fees alleged to be due and owing under the agreement. Zessos then commenced this action in the District Court of Connecticut, alleging, *inter alia,* breach of contract, material misrepresentation, unfair competition, abuse of attachment process, and conspiracy to fix prices. Count five, the sole matter before this court, in essence urges that, in order to obtain an exclusive license to use the Olsten trade name and mark to operate a white collar franchise, Zessos was required to establish and operate a blue collar operation under the "Handy Andy Labor" trademark. According to the complaint, this constituted an illegal tie-in arrangement which is a per se violation of section 1 of the Sherman Act (15 U.S.C. § 1), as well as a violation of section 3 of the Clayton Act (15 U.S.C. § 14). The plaintiff's cross-motion for summary judgment, however, is limited to the claim of a tie in violation of Sherman § 1.[1] The tying product is alleged to be Olsten and the tied product, Handy Andy Labor.

## III  THE QUESTION POSED

### A.  *The Necessity of Coercion*

The first segment of the question posed as controlling is whether the plaintiff, in order to establish unlawful tying, must show actual coercion, outside of the agreement, to operate the tied business. The court below found that the record was "utterly devoid of evidence that Zessos was in any way coerced or compelled to open a Handy Andy office," or "that Zessos attempted to free himself from the supposed burden of having to open a Handy Andy office, or that he

---

1. There is no claim made that the trade name or mark here tied any *commodities.* It is only alleged to have tied the blue collar temporary personnel business, which we would conclude is a service and not a "commodity." Hence section 3 of the Clayton Act is inapplicable. *E. g.,* Advance Bus. Sys. & Supply Co. v. SCM Corp., 415 F.2d 55, 64 (4th Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 101 (1970) (Clayton § 3 is not applicable when either the tying or tied product is a service; here, service was defendant's maintenance of its photocopy machines); MDC Data Centers, Inc. v. IBM, 342 F.Supp. 502, 504 n. 2 (E.D.Pa.1972) (Clayton § 3 by its terms does not cover services; here, engineering services performed by defendant on its leased equipment); United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 554 (E.D.Pa.1960), aff'd per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (government conceded that Clayton § 3 does not apply to tie-ins involving services; here, service contracts to maintain and install defendant's antenna systems). See Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 609 & n. 27, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (government did not proceed under Clayton Act because it believed advertising space was not a commodity; Supreme Court expressed no view on that interpretation).

bargained with Olsten for a white-collar franchise alone." 365 F.Supp. at 894.

We do not think that there can be any question that no tying arrangement can possibly exist unless the person aggrieved can establish that he has been required to purchase something which he does not want to take. Unlike other exclusive-dealing arrangements, which Mr. Justice Frankfurter took pains to distinguish in Standard Oil Co. v. United States, 337 U.S. 293, 300–306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), "[t]ying agreements serve hardly any purpose beyond the suppression of competition," *id.* at 305–306, 69 S.Ct. at 1058. Where a not insubstantial amount of commerce is involved, a tying arrangement constitutes a per se violation of section 1 of the Sherman Act. Northern Pacific Ry. v. United States, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). However, before the plaintiff can become entitled to the benefit of the per se doctrine, and thereby escape the proof otherwise required to establish an undue or unreasonable restraint under the rule of reason approach, it is basic that he first establish that he is the unwilling purchaser of an unwanted product. To that extent there must be a showing of some pressure exerted upon him. This principle has been articulated in this court by Chief Judge Kaufman in American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131, 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972): "[T]here can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice."

The question raised in the pertinent cases is not whether coercive pressure is used but how can it be established. In International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) defendant sought to extend its patent monopoly on machinery by requiring the lessee of the machines to buy only the defendant's salt for use therein, thus depriving the lessee of the right to use other suppliers and foreclosing him from other purchasers. The coercion resulted from the existence of the patented machinery.

In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 608–609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Court commented that tying arrangements are per se violative under Sherman § 1 if the seller enjoyed a "monopolistic" position in the market for the tying product and a substantial volume of commerce in the "tied" product is restrained. But in the later case of *Northern Pacific Ry., supra,* the Court defined monopolistic power as "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product," 356 U.S. at 6, 78 S.Ct. at 518; and a not insubstantial amount of commerce must also be involved. In United States v. Loew's Inc., 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962), the Court added: "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes"; such power is presumed when the tying product is patented or copyrighted.

In its most recent discussion of the tying problem, Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 505 n. 2, 89 S.Ct. 1252, 1259, 22 L.Ed.2d 495 (1969), the Court took pains to point out that "[u]niqueness confers economic power only when other competitiors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented or copyrighted products. . ." The Court also stated: "Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market," *id.* at 503, 89 S.Ct. at 1258.

In this court's latest foray into the tying problem, Chief Judge Kaufman, in discussing the *Loew's* rule, stated that "[p]roduct separability based on quality differentiation has been an essential ingredient in a long line of tying cases."

Coniglio v. Highwood Services, Inc., 495 F.2d 1286, 1291 (2d Cir. 1974).

■ From this review of the cases we conclude that the plaintiff must establish that he was the unwilling purchaser of the tied product. If he was not coerced by the economic dominance of the seller, he at least must show that he was compelled to accept the tied product by virtue of the uniqueness or desirability of the tying product, which other competitors could not or would not supply.

### B. Uniqueness and Desirability

■ The appellant here argues that since the tying service franchised to him (Olsten) was trademarked, the economic power of the defendant must be presumed. We reject this proposition. In the first place, no Supreme Court decision has gone any further than to presume economic power in those cases where the tying product is patented or copyrighted. In such cases, as Mr. Justice Black pointed out in *Fortner, supra,* 394 U.S. at 505 n. 2, 89 S.Ct. 1252, the tying product is unquestionably distinctive and is protected by the statutory grant. However, a trademark or name merely identifies the franchiser. There is no suggestion at all in the record before us, and no claim is made on appeal, that there is something so unique in the temporary office techniques or modus operandi of Olsten that it could not be offered by others. As the Supreme Court has said, a trademark right is not "a right in gross or at large, like a statutory copyright or a patent for an invention . . . . There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 50, 63 L.Ed.

141 (1918). As a practical matter since almost everything sold today is trademarked, the consequences of adopting appellant's position would be troublesome.

Secondly, this circuit has already held that a trademark *qua* trademark is not a sufficient indication of dominance over the tying product to qualify for per se treatment under the *Northern Pacific* rubric. Susser v. Carvel Corp., 332 F.2d 505, 519 (2d Cir. 1964) (Friendly, *J.*) (separate opinion), cert. dismissed as improvidently granted, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965). It is instructive to note that Chief Judge Lumbard, in dissenting from Judge Friendly who wrote for the majority on this point, considered the tying product not simply the Carvel trademark but also nine design patents covering machinery and 20 other appurtenant trademarks. "It is the lease or license of the trademark itself, buttressed by this array of patents and subsidiary trademarks, to which are tied the other products." *Id.* at 513.[2]

· Thirdly, to our knowledge it has never been held that the sale of two trademarked, copyrighted, or even patented commodities, without more, constitutes a tying arrangement. The appellant misreads *Loew's* if he concludes that the mere existence of the copyrighted tying motion pictures was enough to create the tying. The *tied* films were also copyrighted, so that if copyright were the sole factor there would have been a countervailing power. The tying was created by the attractiveness of some of the films, as contrasted to the inferior quality of the others also required to be purchased in the package. Thus the Court in its opinion cited the trial court's "apt example" of forcing a television

2. In a later case involving the same Carvel franchise agreements, *Carvel Corp.,* [1965–1967 Transfer Binder] Trade Reg.Rep.—FTC Complaints & Orders ¶ 17,298 (FTC 1965), the Federal Trade Commission did not even consider the arrangement to constitute a tying situation since "it is conceptually impossible . . . to view a license to use a trademark as separate and distinct from the sale of the trademarked product or its ingredient," id. at 22,426. The opinion is discussed in 1 M. Handler, Twenty-Five Years of Antitrust 643–52 (1973) ; S. Oppenheim & G. Weston, Federal Antitrust Laws 606–08 (3d ed. 1968) ; and I. L. Schwartz, Free Enterprise and Economic Organization 669 (3d ed. 1966).

station which wants "Gone With The Wind" to take with it "Getting Gertie's Garter." United States v. Loew's Inc., supra, 371 U.S. at 48 n. 6, 83 S.Ct. 97.[3] Once the attractiveness of the tying product is established, the economic power test is then met by the patent or the copyright, since competitors cannot offer the distinctive product (e. g., Gone With The Wind) without violating the patent or the copyright of the tier. Fortner, supra, 394 U.S. at 505 n. 2, 89 S.Ct. 1252.[4]

In urging us to find sufficient economic power in the mere existence of Olsten's trademark, appellant places reliance upon two franchise cases in other circuits, Warriner Hermetics, Inc. v. Copeland Refrigeration Corp., 463 F.2d 1002 (5th Cir.), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972), and Siegel v. Chicken Delight, Inc., 448 F.2d 43 (9th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972). It might be sufficient to say that Carvel from this circuit is contrary, as both Copeland and Chicken Delight recognize. More pointedly, all three involved a well-recognized and customary tying situation—the franchiser of a trademarked or named enterprise forcing his franchisee to purchase commodities not wanted but allegedly necessary to maintain product quality. In Carvel and Chicken Delight, the franchiser required the franchised outlet to purchase certain supplies which purportedly promoted more delectable ice cream and more succulent poultry. In Copeland, the defendant was the nation's largest producer of rebuilt commercial refrigeration compressors and parts; its franchised wholesaler dealers, in replacing failed refrigerators, were required to use Copeland parts exclusively, albeit at a healthy discount from the suggested retail price. All of these cases were traditional tying situations and were so recognized by all the courts, except that the majority in Carvel failed to find that the tying product (the trademark) had the requisite leverage, 332 F.2d at 519.

These cases involved questions of market dominance and product quality maintenance not before us because here the plaintiff has not even established any tie-in. As we have pointed out, there is no showing that Olsten's white collar business is any more attractive, unique, desirable, or effective than any other. All that appellant argues is that the mark is distinctive, but not that the service is. Even proceeding on a per se theory (for which there is no basis at all in our judgment), there is no showing that Olsten dominated any market or any group of buyers, actual or prospective, of temporary office personnel franchises. The complaint on appeal that the lower

---

3. One hardly has to be a film aficionado to recognize that the actual package offered in Loew's was only slightly less bizarre, if at all. Thus to get "Treasure of the Sierra Madre," "Casablanca," "Johnny Belinda," "Sergeant York," and "The Man Who Came to Dinner," the station involved also had to take "Nancy Drew Troubleshooter," "Tugboat Annie Sails Again," "Kid Nightingale," "Gorilla Man," and "Tear Gas Squad." 371 U.S. at 41–42, 83 S.Ct. 97. The latter hardly qualify as film classics.

4. As we have already noted, the presence of the trademark does not at all prevent a competitor from duplicating the distinctive features of the allegedly tying product; see Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). He is only precluded from infringing on the mark. Judge Blumenfeld's observation below that Fortner somehow vindicates the dissenting opinion in Carvel (365 F.Supp. at 892 & n. 9) must be clarified. While it is true that Fortner further diluted the market dominance criterion for tying, the elucidation of the product desirability factor we have just discussed would disqualify the trademark as a tying attribute of the copyright-patent genre. In any event since Carvel involved franchising and Fortner did not, perhaps more significant is the Supreme Court's benevolent attitude toward vertical restrictions upon franchisees, expressed in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 379–380, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The Court there refused to apply a per se approach to such restrictions where there was no sale of a product. Here, of course, there is no claim that the franchiser tied any commodities which he sold.

court ignored the fact that a not insignificant amount of interstate commerce was involved fails to recognize that, since there is no tie-in, the business consummated is irrelevant. As far as the record is concerned, appellant's recitation that he was an innocent purchaser who had not even heard of Olsten before he was approached demonstrates not simply unequal bargaining power (which must almost always be present when an individual entrepreneur seeks a business relationship with an established franchiser), but also that Olsten was hardly a household name even to this college graduate marketing major.

### C. Compulsion by Contract

The controlling question next asks whether the compulsion creating the tying can be provided by the franchise agreement itself, which, appellant contends, required him to open a Handy Andy operation in Hartford "commencing 6 months from the date hereof" (September 17, 1965). The amendment to the agreement executed on August 23, 1969 extended Zessos's time to open a Handy Andy office in Hartford and New Haven to December 31, 1969. As we have indicated in reciting the facts, Zessos never opened a blue collar operation in Hartford; his blue collar operation in New Haven started in September, 1969 and was terminated by him in June, 1971.

The court below construed paragraph 2 of the agreement [5] as a provision which granted Zessos only the *option* to use the Handy Andy license if he desired to enter the blue collar business, in which case he could not exercise the option until after 6 months. Moreover, the court below found as a matter of law that the plain language of the contract did not bind Zessos in any way to enter the blue collar business (365 F.Supp. at 896). The court's opinion details evidence submitted on the motion, including Zessos's own deposition, which would indicate that there was a gentleman's agreement that no blue collar operation had to be commenced within any set time limit despite the plaintiff's interpretation of the contract, and further that Zessos was not, in fact, unwilling to open the New Haven Handy Andy. We do not share the view of the court below that the language of the agreement is so pellucid. However, the conduct of the parties prior to the amendment would bear out this interpretation, even if the language is ambiguous.[6] The court below also noted that the agreement provided for only one franchise fee ($6000), for the white collar operation; there was no mention of any allocation of this fee to, or any additional fee for, Handy Andy.

Accepting arguendo the plaintiff's interpretation of the contract, it does not follow that because the contract required the opening of a blue collar op-

5. "The grant of the license hereunder includes the right of the LICENSEE to use the trade mark and name HANDY ANDY LABOR. All 'blue collar' personnel shall be supplied by a division of the LICENSEE designated as HANDY ANDY LABOR commencing six (6) months from the date hereof. For the purposes of standards and rate of franchise fee, the total of all billings from whatever source shall be included.
"The division shall be known as HANDY ANDY LABOR, a division of OLSTEN'S OF GREATER HARTFORD, INC. At the option of the LICENSEE, such division may be operated as a separate corporate entity. In such event, it shall be designated as HANDY ANDY LABOR OF GREATER HARTFORD, INC. In either event, separate bookkeeping shall be kept for the 'blue collar'

division. In the event the LICENSEE incorporates, all of the provisions as set forth in paragraph 23 shall apply."

6. The appellant urges that the language of the agreement clearly required the opening of a Handy Andy operation; if this were so, the subsequent conduct of the parties would be irrelevant since Sherman § 1 condemns the *contract* in restraint of trade and not the later behavior of the parties. Appellant relies here on the oft-cited footnote 59 in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 224–226, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), a price fixing case, although the rationale would seem clearly applicable to any per se violation—assuming we were dealing with one.

eration, it was therefore a tying arrangement. Quite obviously, a franchise agreement, like any contract of sale, may obligate the purchaser to accept numerous commodities, trademarked or not; this does not mean that the purchaser was coerced in any fashion to take some or all to get one or some. This is again the fatal flaw in appellant's case. While Zessos did testify on his deposition that the two services were sold as a package, there is no proof or evidence to suggest that he objected to the package,[7] that he was only interested in a white collar operation, that the blue collar operation was forced upon him, or (as we have stated before) that the Olsten white collar mark and service were so unique and attractive that he had no alternative. He also asserts that he did not want to operate a blue collar operation in 1968 or 1969, but this is totally consistent with the position that, although he agreed initially he later changed his mind. Moreover, as the court below indicated, Zessos's own notes in 1969 stated: "I'm certainly going to open another Olsten office everywhere I can.—Open Handy Andy & these office [sic] at my option.—Dec. 31, 1969."

### D. *Exclusive Dealing*

The second segment of the "controlling" question reads: "[i]s it sufficient [for plaintiff's antitrust action] to show that the plaintiffs were restricted by the contract imposed by the defendant in operating any blue collar business other than under the HANDY ANDY mark with the payment of franchise fees to the defendant."

It is difficult to understand how this can be a controlling question on the appeal since the record does not indicate that the argument was ever raised below. It represents a different interpretation of the contract than that which appellant maintained below and on this appeal. It is not based on any language in para. 2 of the agreement, but on paras. 25 and 26.

The first of these precludes the franchisee from competing "directly or indirectly with the operation of temporary office personnel business." This by itself has no antitrust significance; if the argument is that blue collar is a competing business, then it is in conflict with the appellant's continuing position that the latter is a totally separate and distinct operation. Para. 26 is a typical restrictive covenant preventing the licensee, upon termination of the franchise agreement, from entering into a similar business, directly or indirectly, within a limited geographic area and time period. This paragraph defines "similar business" as one providing "personnel whether temporary or permanent with or without fee." Assuming that the two paragraphs can be read together, and that the agreement can in fact be construed to restrict plaintiff to defendant's blue collar business, there is still no conceptual relationship to tie-ins. As we have pointed out recently in Bradford v. New York Times Co., 501 F.2d 51 (2d Cir. 1974), restrictive covenants of this nature have invariably been litigated in state courts or in diversity cases in federal courts applying state law. They do not rise to the status of Sherman Act violations; in fact, no court applying the rule of reason has ever held them to be violative of the Act, *Bradford* at 59. And they are certainly not of per se stature.

Aside from the restrictive covenants, there is nothing in the agreement to support the construction now urged. Even if the contract be so construed, it would not amount to a tie-in (which is what plaintiff claims in his fifth count) but a form of exclusive dealing which, in any

---

7. Cf. American Mfrs. Mut. Ins. Co., *supra*, in which plaintiff, a TV sponsor, sued a TV network for allegedly forcing plaintiff to sponsor its products on both desirable and undesirable stations, the latter being tied into the former. This court, in finding no illegal tying arrangement, noted: "[Plaintiff] did not persevere long enough with its ideal [TV] lineup to feel any economic pressure from ABC, and we cannot know whether ABC would ever have tried to bring any such pressure to bear." 446 F.2d at 1137.

event, cannot be a per se violation of Sherman § 1 or Clayton § 3. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The latter section is the normal basis for an exclusive-dealing case but, as we have pointed out, no commodities are involved here and hence Clayton § 3 is inapplicable.

We conclude that the controlling question posed, while hardly precise and in part probably irrelevant, nonetheless deserved a response in which we found no error below and no solace for the appellant within the agreement or the interstices thereof. There is no demonstration whatsoever that Zessos was coerced or even seduced into the acceptance of the blue collar business. While the advantages to a plaintiff of the per se doctrine are obvious, the tying alleged here is ersatz at best.

## IV  SUMMARY JUDGMENT

■   Aside from the assertions of error with respect to the substantive issues raised here, appellant urges that the court erred in any event in granting summary judgment since there were material issues of fact which could not be determined without a trial by jury. The fact that the plaintiff himself cross-moved for summary judgment below, while significant, does not bar his raising the issue on appeal;[8] however we do not find any genuine issue of fact which requires trial.

■■   Zessos argues that para. 2 of the agreement is ambiguous and that the court below erred in holding it to provide the franchisee merely an option to open a Handy Andy. However, even if appellant's construction is accepted, we have already pointed out that no tying agreement emerges. Zessos also argues that if coercion be required then the "motives" of the buyer become an issue. However, since he has failed to establish

any tying at all, it is difficult to see how his "motives" are crucial. He relies on Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472–473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) for the position that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play important roles. Aside from the fact that the litigation before us is hardly complex and is of spurious Sherman Act stature, the Court in *Poller* was considering charges of wide-ranging conspiracy both to restrain trade and to monopolize under sections 1 and 2 of the Sherman Act. Where there is conspiracy or attempt to monopolize, courts do require proof of specific intent, and this normally involves trial. See United States v. Alcoa, 148 F.2d 416, 431–432 (2d Cir. 1945). We have no such requirement in tying cases. The same argument based upon *Poller* was recently rejected by this court in affirming a summary judgment in a tying case. Coniglio v. Highwood Services, Inc., *supra*, 495 F.2d at 1292–1293.

Appellant finally alleges that in any event, quite aside from per se tying, he has urged (in para. 40 of his complaint) that the defendant has restrained competition in the blue collar franchise market and that this issue has not been litigated below. However, para. 40, if read in its entirety, provides:

> The defendant's unique registered trade name and trade mark OL-STEN'S, in combination with its demonstrated power to require the tie-in of a Handy Andy Labor operation in order to obtain a white collar Olsten franchise, is in fact and as a matter of law, sufficient economic power appreciably to restrain competition in the blue collar franchise market.

It is clear that para. 40 and the entire fifth count are devoted to the plaintiff's theory that there was a tie-in sale

8. *E. g.*, Eagle v. Louisiana & S. Life Ins. Co., 464 F.2d 607, 608 (10th Cir. 1972); Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968); Jacobson v. Maryland Cas.

Co., 336 F.2d 72, 74–75 (8th Cir. 1964), cert. denied, 379 U.S. 964, 85 S.Ct. 655, 13 L.Ed.2d 558 (1965).

here. Further, there is nothing suggested even on appeal that any market study would evidence any dominance by defendant at all, in either the white or blue collar markets, in any relevant market area. *Fortner,* relied upon here again, involved not only restraint of trade but also monopolization under section 2 of the Sherman Act.

We further note here that only one count of the complaint (the fifth) has been dismissed, and in the sixth count the plaintiffs urge that para. 2 (among others) of the agreement constitutes a contract, combination, or conspiracy in violation of section 1 of the Sherman Act; therefore, plaintiff may have the opportunity to litigate this point again.

We conclude that there is no genuine issue of material fact here and that partial summary judgment dismissing the fifth count was appropriate.