L & J CREW STATION, LLC Plaintiff,

v.

BANCO POPULAR DE PUERTO RICO, and First Bank Puerto Rico, Defendants.

No. CIV.2003–11.

District Court, Virgin Islands, D. St. Thomas and St. John.

Aug. 20, 2003.

Clive Rivers, St. Thomas, VI, for the plaintiff.

Gregory Hodges, St. Thomas, VI, for the defendants.

### MEMORANDUM

MOORE, District Judge.

Defendants Banco Popular de Puerto Rico ["Banco Popular"] and FirstBank Puerto Rico ["FirstBank"] [collectively "Banks" or "defendants"] move to dismiss the first amended complaint of plaintiff L & J Crew Station, LLC ["L & J" or "plaintiff"] for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I will grant defendants' motion to dismiss.

### I. FACTUAL BACKGROUND

L & J opened two accounts, 193–041763 and 193–041861, with Banco Popular [col-lectively, the "Banco Popular Accounts"] on June 25, 2002 and July 12, 2002, respectively. In the process of opening these accounts, L & J signed addenda to the Deposit Accounts Agreement Handbook for Banco Popular [the "BP Handbook"], by which it acknowledged and agreed that

[t]he provisions of this Agreement will be in full force until one of the parties notifies the other of its intention to cancel the Service. Any of the Parties may cancel this Agreement upon written notification to the other. The Bank acknowledges the right to cancel the Service at any time. Depositor agrees that the cancellation notice provided by the Bank at least ten (10) days prior to the termination date will be considered reasonable notice. Notice of cancellation will be sent by regular mail. The Bank will not be liable for the payment of Payment Orders after the cancellation notice is mailed. Depositor is liable for charges or any other obligation incurred in relation to this Agreement, before the cancellation date is effective. Questions and concerns regarding this Agreement or the Addendum may be made by calling Popular Telebank.

When L & J opened the Banco Popular Accounts, it did not inform Banco Popular that it was in the money transmitting business. By August 2002, Banco Popular became concerned regarding the nature, volume, and amounts of the transactions passing through the Banco Popular Accounts. On August 26, 2002, Raymond L. Green ["Green"], Banco Popular's Operations Manager for the Virgin Islands Region, visited the plaintiff's business premises to, among other things, learn more about the nature of its business, its banking needs, and its financial controls and reporting. Green learned that L & J had little or no internal controls or procedures and that it had no, or did not follow, an

anti-money laundering compliance program for money services businesses. As a result of that visit and subsequent telephone conversations between Banco Popular and L & J, Banco Popular sent plaintiff a letter dated September 30, 2002, giving L & J notice of Banco Popular's decision to terminate its banking services with plaintiff on the ground "that continued maintenance of L & J's accounts pose[d] an undue regulatory and compliance burden."

In response to the letter, plaintiff sent Banco Popular a letter dated October 7, 2002 from Express Padala (USA), Inc. ["Express Padala"], wherein Express Padala requested, on behalf of L & J, an extension of the deadline for account closing until October 31, 2002. On October 15, L & J itself petitioned Banco Popular by letter for a 60–day extension of the account closing deadline and advised that if an immediate closing of the accounts took place, it would be irreparably harmed. The following day, Banco Popular responded to plaintiff's letter stating that it would extend the account-closing deadline until October 31, 2002, provided that L & J acknowledged and agreed to certain conditions set forth in that letter, in particular notice of Express Padala's anti-money laundering compliance policies and procedures. Banco Popular also reserved the right to reject these compliance policies and procedures after review and proceed with the closing of L & J's account. On October 29, 2002, L & J provided Banco Popular with a certificate of Express Padala's qualification as a foreign corporation and a designation of Leo Lim d/b/a L & J as Express Padala's agent for service of process. After reviewing the documents submitted by plaintiff, Banco Popular informed L & J in a letter dated November 22, 2002 that it intended to proceed to close the Banco Popular Accounts. On December 4, 2002, Banco Popular closed the Banco Popular Accounts and remitted to L & J the balance remaining in these accounts at closing.

On November 21, 2002, L & J opened account number 7191381934 ["Account 1934"] at FirstBank. Just as with Banco Popular, L & J did not inform FirstBank that it was in the money services or transmitting business. In addition, plaintiff did not tell FirstBank that Banco Popular had given notice of its intent to close L & J's accounts. By early December, FirstBank also became concerned about the nature, the volume, and the amounts of the transactions in Account 1934. On December 5, 2002, representatives of L & J and its counsel met with Ariane Joseph–Lewis ["Joseph–Lewis"], FirstBank's Manager of its USVI Branches. At this meeting, plaintiff disclosed to FirstBank, for the first time, that it was in the money transmitting business. Joseph–Lewis expressed concerns about whether FirstBank would be able to continue banking relations with L & J under these circumstances, but said that she would contact L & J after consulting with the bank's senior executive. Notwithstanding this statement of reservation regarding any continued banking relationship, on December 9, 2002, plaintiff managed to open another account at FirstBank, account number 7191382134 ["Account 2134"].

In opening both of these accounts [collectively the "FirstBank Accounts"], plaintiff executed an agreement that permitted FirstBank to close its accounts at will.

> Closing Accounts. We may close your Account at any time in our sole discretion. FirstBank will not be required to provide advance written notice to you of our intent to close your Account, but if such notice is provided, FirstBank will not be required to pay checks or other orders of withdrawals drawn on your Account that are dated more than ten

(10) business days after the notice is mailed to you. If your Account is closed, FirstBank will mail any balance on your account to your last known mailing address, as it appears in our records. You will be considered to have closed your savings account, if your savings account balance is drawn to zero at any time.

During the week of December 16, 2002, Joseph–Lewis informed plaintiff that FirstBank had a policy of not doing business with money transmitters and that FirstBank would be discontinuing business relations with L & J. On January 15, 2003, FirstBank sent L & J notice of its intent to close plaintiff's accounts by January 31, 2003. FirstBank later reconfirmed this decision by letter on January 30, 2003. Upon closing these accounts on January 31, FirstBank mailed plaintiff checks for the balances remaining in the FirstBank Accounts at closing. That same day, L & J sued defendants in this Court alleging various antitrust claims under the Sherman Act and the Clayton Act. This Court has federal question jurisdiction under section 22(a) of the Revised Organic Act of 1954 [1] and 28 U.S.C. § 1331.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard.

In considering the defendants' motion to dismiss under Rule 12(b)(6), a court "may dismiss [the] complaint if it appears certain the plaintiff cannot prove any set of facts in support of [her] claims which would entitle [her] to relief." *See Bostic v. AT & T of the Virgin Islands*, 166 F.Supp.2d 350, 354 (D.Vi.2001) (internal quotations omitted); *see also Julien v. Committee of Bar Examiners*, 34 V.I. 281, 286, 923 F.Supp. 707, 713 (D.Vi.1996); FED.

R. Civ. P. 12(b)(6). I must accept as true all well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bostic*, 166 F.Supp.2d at 354; *Julien*, 34 V.I. at 286–87, 923 F.Supp. at 713.

### B. Sections 2(e) and 3 of Clayton Act Only Apply to Commodities Bought for Resale.

#### 1. *Claims Under Section 2(e) Must Be Based on Sale of Commodities.*

 Count I of plaintiff's complaint alleges that the Banks have violated section 2(e) of the Clayton Act, 15 U.S.C. § 13(e). By its plain terms, section 2(e) applies only to the sale of "commodit[ies] bought for resale."

> It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(e). In order to state a claim for relief under the Clayton Act, therefore, the plaintiff's allegation must relate to discriminatory practices involving the purchase of some tangible commodity for resale. *See Fleetway v. Public Serv. Interstate Transp. Co.*, 72 F.2d 761, 763 (3d Cir.1934) (affirming denial of injunctive relief where plaintiffs claim related to services and not commodities because the Clayton Act "clearly refers to a commodity

---

1. 48 U.S.C. § 1612(a). The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541–1645 (1995 & Supp.2003), *reprinted in* V.I. CODE ANN. 73–177, Historical Docu-

ments, Organic Acts, and U.S. Constitution (1995 & Supp.2003) (preceding V.I. CODE ANN. tit. 1).

such as merchandise"); *Kennedy Theater Ticket Serv., v. Ticketron, Inc.,* 342 F.Supp. 922 (E.D.Pa.1972) (affirming dismissal of complaint where plaintiffs claims related to services, not commodities); *Gaylord Shops, Inc. v. Pittsburgh Miracle Mile Town & Country Shopping Ctr., Inc.,* 219 F.Supp. 400, 403 (W.D.Pa.1963) (holding that there can be no violation of the Clayton Act "where the agreement is not for the transfer of chattels, or the sale of personal property").[2]

It is without question that banking services are of a different nature and quality than the sale of a tangible good. *Cf. Wendkos v. ABC Consol. Corp.,* 379 F.Supp. 15, 18 (E.D.Pa.1974) (finding that money is not a commodity within the meaning of the Clayton Act); *United States v. Investors Diversified Servs.,* 102 F.Supp. 645, 647 (D.Minn.1951) (finding that the contract for the loan of money secured by a real estate mortgage is not a commodity). Therefore, banking services do not constitute a sale of commodities and are not within the coverage of the Clayton Act. *See Bichel Optical Labs., Inc. v. Mar-quette Nat'l Bank of Minneapolis,* 336 F.Supp. 1368, 1371 (D.Minn.1971) (distinguishing banking services from the sale of a commodity, which is "an absolute transfer of property"). As there is no basis for treating the Banks' refusal to provide banking services to plaintiff as a commodity within the meaning of the Clayton Act, L & J's section 2(e) claim must be dismissed.

### 2. Claims under Section 3 Must Be Based on Sale of Commodities in Commerce.

■ Similarly, plaintiff's allegation in Count I that the defendants violated section 3 of the Clayton Act must also be dismissed. By its plain language, section 3 applies only to the lease or sale "of goods, wares, merchandise, machines, supplies or other commodities." 15 U.S.C. § 14. The law and analysis articulated above regarding the definition of commodities within the context of section 2(e) apply with equal force to the phrase "other commodities" used in section 3. Indeed, just as courts, in adherence to the Act and its legislative

---

**2.** *See also Capital Temps., Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 661 n. 1 (2d Cir.1974) (finding the Clayton Act inapplicable where plaintiff alleged unfair practices related to services); *Tri–State Broad. Co. v. United Press Int'l, Inc.,* 369 F.2d 268, 270 (5th Cir.1966) (affirming dismissal of complaint based on alleged Clayton Act violations related to news information services, stating "[l]egislative history and subsequent congressional studies clearly indicate that Section 2(a) of the Act was intended to encompass only tangible articles of commerce"); *Columbia Broad. Sys., Inc. v. Amana Refrigeration, Inc.,* 295 F.2d 375 (7th Cir.1961) (holding that a contract for the sale of news information services did not constitute the sale of a "commodity" within contemplation of section 2(e) of the Clayton Act); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 293 F.Supp. 1004, 1005–06 (N.D.Ill.1968) (stating that "the legislative history of what is now section 13(a) clearly indicates that the cover-age of the law was limited to tangible articles and products, and was not meant to include all elements of commerce such as intangibles or services").

Furthermore, the legislative history of the Clayton Act illuminates the intended meaning of the term "commodity," limiting it to tangible items, not services. Congressman Patman, in discussing the definition of the term, stated:

> In its broadest sense, the word 'commodity' might possibly include items of trade other than those in tangible form-for example, advertising, insurance, brokerage service, and similar items. *However, the word is ordinarily used in the commercial sense to designate any movable or tangible thing that is produced or used as the subject of barter. This is the definition of the word 'commodity' used in the application of the Robinson–Patman Act.*

PATMAN, COMPLETE GUIDE TO THE ROBINSON-PATMAN ACT 33 (1963) (emphasis added).

history, have strictly construed "commodities" under section 2(e), so too have the courts taken a narrow view of the scope of section 3. *See Wendkos*, 379 F.Supp. at 18; *MDC Data Centers, Inc. v. IBM*, 342 F.Supp., 502, 504 n. 2 (E.D.Pa.1972) (holding that section 3 does not cover services); *United States v. Jerrold Elecs. Corp.*, 187 F.Supp. 545, 554 (E.D.Pa.1960), *aff'd per curiam*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961) (noting that government conceded that section 3 of the Clayton Act did not apply to services). Accordingly, L & J's section 3 claim cannot stand.

### C. There is No Cause of Action Under The Clayton Act for Refusal to Deal.

■■■ Not only is the Clayton Act inapplicable because commodities are not involved, but even if the Clayton Act was relevant to the facts of this case, the Banks' refusal to deal with L & J is not prohibited under the Act. Although the Clayton Act aims to prohibit discriminatory treatment of commodity purchasers by sellers and targets executed agreements that treat such purchasers differently, it does not target a party's refusal to deal with a particular customer. "[A] mere refusal to deal does not give rise to a violation of the Clayton Act. Section two of the Clayton Act, 15 U.S.C. § 13, expressly recognizes a party's right to choose its own customers on the basis of business necessity." *Hancock Indus. v. Schaeffer*, 619

F.Supp. 322, 332 (E.D.Pa.1985) (internal citations omitted).[3]

Furthermore, the fact that Banco Popular may continue to allow larger, more established money remittance businesses to continue to maintain accounts, while electing to close plaintiff's accounts does not constitute any claim for which relief may be granted under the Clayton Act since maintaining business relationships with some customers and not others is "not the type of discrimination prohibited by the [Act]." *See Purdy*, 594 F.2d at 1318. Accordingly, as the defendants' refusal to deal with plaintiff is not a violation of the Clayton Act, I will dismiss Count I of L & J's complaint in its entirety.

### D. L & J Fails To Plead Sherman Act Claim

In addition to his Clayton Act claims, plaintiff alleges in Counts II and III of the complaint that the Banks' respective actions constitute violations of the Sherman Act, 15 U.S.C. §§ 1–7. Such claims, however, fail for myriad reasons.

#### 1. *Plaintiff Failed to Define the Relevant Market.*

■■ When alleging Sherman Act violations, a plaintiff has the burden of defining the relevant market. *See Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir.1997). "Fail[ure] to define [a] proposed relevant market with reference to the rule of reasonable interchangeability

---

**3.** *See also Purdy Mobile Homes, Inc., v. Champion Homes Builders Co.*, 594 F.2d 1313, 1318 (9th Cir.1979) ("It has long been recognized that the statute does not require a seller to sell to, or maintain a customer relationship with, any buyer or prospective buyer."); *House of Materials, Inc. v. Simplicity Pattern Co.*, 298 F.2d 867, 871 (2d Cir.1962) ("When Congress enacted the Clayton Act, it rejected a provision which would have prohibited arbitrary refusals to sell because it was being projected into a field of legislation 'untried, complicated and dangerous.' "); *McElhenney Co. v. Western Auto Supply Co.*, 269 F.2d 332, 337 (4th Cir.1959) ("Neither in terms nor inferentially does [the Act] prohibit a unilateral refusal to sell"); *Naifeh v. Ronson Art Metal Works*, 218 F.2d 202, 206 (10th Cir.1954) ("[A] seller may either refuse to negotiate or may cease doing business with a customer without running afoul of the Act").

and cross-elasticity of demand" is grounds for dismissal. *See id.* (stating additionally that "a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor" is also considered "legally insufficient") (citations omitted).[4]

■■■ For antitrust purposes, the relevant market consists of a geographic market and product market. *See Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922, at *5 (E.D.Pa. Aug.9, 2002). A product market is defined as "those commodities reasonably interchangeable by consumers for the same purposes," whereas the geographic market is the "area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722, 726 (3d Cir.1991) (citations omitted). L & J's complaint fails to identify either the product market or the geographic market.

■■■ First, the complaint refers to banks located on St. Thomas and the Virgin Islands as a whole without identifying which is the specific geographic market. (Compl.¶¶ 24, 25.) Furthermore, the complaint is unclear whether the relevant product market is all banking services or just money remittance services. Identification of the relevant market is crucial to the determination of market share and whether a monopoly even exists. For example, if the market in issue is the one for money remittance services, then all such

services, including those provided by Western Union, Money Gram, and others, must be included in the analysis of market. On the other hand, if the relevant product market were banking services generally, other banking institutions, including federal credit unions and other local banks providing such services must also be included. All banks and other businesses providing services akin to money remittance or banking services must be identified because "substitute products must also be considered [in defining the relevant market], as customers may turn to them if there is a slight increase in the price of the main product." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *see also Re–Alco Indus.*, 812 F.Supp. at 392 (dismissing complaint where plaintiff failed to "discuss the existence or nonexistence" of alternate products "and any relevant differences in demand").

Since identification of the relevant market is a prerequisite for any monopolization or attempt to monopolize claim alleged under the Sherman Act, I could simply end here and dismiss Count II and Count III of the complaint for failure to state a claim. The many other defects within the complaint, however, need also be addressed.

### 2. *Plaintiff Failed to Allege Combination or Conspiracy.*

■■■ Section 1[5] of the Sherman Act prohibits "[e]very contract, combina-

---

**4.** *See also Syncsort Inc., v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 330 (D.N.J. 1999) ("Viability of claims of monopolization and attempted monopolization under Section Two of the Sherman Act are dependent upon a demonstration by a plaintiff why a proposed market is the relevant market."); *Fresh Made, Inc. v. Lifeway Foods, Inc.*, 2002 WL 31246922 at *5 (E.D.Pa.2002) (quoting *Re–Alco Indus., Inc. v. Nat'l Ctr. For Health*

*Educ.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993)) ("where the plaintiff fails to define its proposed market with reference to the rule of interchangeability and cross-elasticity of demand ... even when all the factual references are granted in the plaintiffs favor, the relevant market is legally insufficient and a motion to dismiss may be granted.").

**5.** Technically, L & J should have claimed a cause of action under section 3 of the Sher-

tion ... or conspiracy in restraint of trade ...." *See* 15 U.S.C. § 1. To establish a civil cause of action under section 1, L & J must be able to allege and prove four elements:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 572 (3d Cir.1986). "The presence of concerted action is thus an essential element of a claim under Section 1; *mere unilateral or independent activity, whatever its motivation, cannot give rise to an antitrust violation.*" *Id.* (emphasis added); *see also Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) ("Independent action is not proscribed" by section 1); *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir.1985) ("Because of this concerted action requirement, unilateral or independent activity, no matter what its motivation, does not violate section 1 .... Thus, both [defendants] may lawfully refuse to sell to [plaintiff], for whatever reason, so long as they act independently from any agreement between themselves.")

■ Nowhere in Count II or Count III of its complaint does L & J allege the requisite concerted action by the Banks with each other. There are no allegations of any meetings, conversations, telephone calls, or memoranda between the Banks.

In fact, plaintiff fails to allege even a scintilla of joint action of any sort by the two defendants. L & J has not even attempted to controvert the Declarations of Green and Joseph–Lewis submitted in support of the defendants' opposition to plaintiff's motion for preliminary injunction that there were no communications between Banco Popular and FirstBank whatsoever regarding the closing of any accounts maintained by L & J at either of the Banks. Accordingly, this failure to allege any concerted action on the part of plaintiff cripples its efforts to allege any section 1 violation for failure to deal, the type of violation alleged in Counts II and III.

3. *Plaintiff Failed To Allege Elements of Monopolization*

■ To the extent L & J seeks to raise a monopolization claim under section 2 of the Sherman Act, plaintiff has again failed to allege the requisite elements of such a claim. A violation of section 2 of the Sherman Act has two elements: "(1) possession of monopoly power in the relevant market, and (2) willful acquisition or maintenance of that power, as distinguished from growth or development as consequence of superior product, business acumen, or historic accident." *Grinnell Corp.*, 384 U.S. at 570–71, 86 S.Ct. 1698; *LePage's, Inc. v. 3M*, 324 F.3d 141, 149 (3d Cir.2003) (quoting *Grinnell Corp.*); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils.*, 159 F.3d 129, 141 (3d Cir.1998) (citations omitted). Thus, to be successful, L & J must allege that either defendant possessed a monopoly and used concerted means either to acquire or maintain such a monopoly. As previously discussed, plaintiff failed to identify the rele-

man Act, 15 U.S.C. § 3, rather than section 1. Section 3 is the exact counterpart of section 1 and is made expressly applicable to the territories and the District of Columbia. *See Dart*

*Drug Corp. v. Parke, Davis & Co.*, 344 F.2d 173 (D.C.Cir.1965). For the sake of clarity, however, this Court will cite to section 1.

vant market. This failure also affects its section 2 claim as it is unclear whether any monopoly exists or what market share either defendant holds. Monopoly power is the "power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Thus, failure to plead facts demonstrating that the Banks maintain a monopoly is grounds for dismissal.[6]

In this instance, L & J fails to identify the relevant market, much less allege that Banco Popular or FirstBank individually have monopoly power in any relevant market. To the contrary, plaintiff merely alleges that the market for banking is split in unstated proportions among three banks: Scotiabank,[7] FirstBank, and Banco Popular. (Compl.¶ 26.) L & J offers no affidavits or other evidence to establish the supposed market share of either FirstBank and Banco Popular. From these scant, unsupported allegations, there is no reasonable manner for this Court to conclude that a monopoly exists. It is possible that Banco Popular or FirstBank possesses a monopoly power in banking services in the Virgin Islands, assuming arguendo that this is the relevant market.

Likewise, it is equally conceivable that ScotiaBank has a monopoly power in this market or that the market is shared roughly equally between these three banks.[8] For these reasons, plaintiff has failed to allege that the Banks possess monopoly power in the relevant market.

### 4. Plaintiff Failed to Allege Elements of Attempted Monopolization

To the extent L & J seeks to raise a claim of attempted monopolization under section 2 of the Sherman Act, plaintiff has again failed to allege the requisite elements of such a claim. A claim of attempt to monopolize has three requirements: (1) the specific intent to monopolize, (2) predatory or unlawful conduct in furtherance of the monopolization, and (3) the dangerous probability of success. See *Crossroads Cogeneration Corp.*, 159 F.3d at 141; *Queen City Pizza*, 124 F.3d at 442; *Schuylkill Energy Res. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 413 (3d Cir.1997); *Pastore v. Bell Tel. Co.*, 24 F.3d 508, 512 (3d Cir.1994). L & J fails to allege any of these elements sufficiently to establish a claim for attempted monopolization.

---

6. *See World Arrow Tourism Enters., Ltd. v. Trans World Airlines*, 582 F.Supp. 808, 811–12 (S.D.N.Y.1984) (granting dismissal of complaint where plaintiff failed to set forth any facts regarding market share and failed to plead any facts indicating that the defendant had the power to fix prices or exclude competition in the relevant market). "As a matter of law, a successful monopolization claim requires a very large market share of the relevant market. Generally, a 75–80% share of the market is required to make out a successful monopolization finding under § 2." *Stepp v. Ford Motor Credit Co.*, 623 F.Supp. 583, 592 (E.D.Wis.1985) (granting summary judgment against plaintiff that failed to demonstrate the existence of a monopoly).

7. Even though L & J presented evidence at the preliminary injunction hearing that Sco-

tiaBank similarly refused to provide it banking services, it has not named ScotiaBank as a defendant in this case.

8. *Cf. Brokerage Concepts v. U.S. Healthcare, Inc.*, 140 F.3d 494, 517 (3d Cir.1998) (noting that courts will generally not find substantial market power if market share is less than 30 percent); *Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 749–50 (3d Cir.1996) (finding that company's 47 percent share of market, without more, was not enough to establish monopoly power); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 201 (3d Cir.1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power.").

First, L & J does not point to any intent on the part of the Banks to monopolize the money remittance market. In fact, plaintiff acknowledges that Banco Popular continues to allow larger money remittance businesses to maintain accounts and that the amount of money remitted by L & J is "minute" compared to other money remitters in the Virgin Islands. (Compl.¶ 27–29.) It is illogical for L & J to argue that the Banks are attempting to create a monopoly over the money remittance business while acknowledging that the Banks continue to handle accounts for larger potential competitors in that business. L & J's failure to describe the relevant market together with the absence of any clear anti-competitive behavior by the defendants means that plaintiff has failed to plead the intent element properly.[9]

Second, plaintiff's failure to describe the relevant market also effects its ability to sufficiently plead a "dangerous probability of success". "Determining whether a 'dangerous probability' exists requires 'inquiry into the relevant product and geographic market and the defendant's economic power in that market.'" *See Pastore,* 24 F.3d at 512 (quoting *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)). Since no market has been defined, it is impossible to evaluate competition in the market or, more importantly, the defendants' particular share of that market. Without knowing what share each defendant holds in the relevant market, "there can be no inference that defendants hold sufficient economic power in that market to create a dangerous probability of monopoly." *Id.* at 513 (citations omitted).

Finally, the closing of plaintiff's bank accounts does not appear to be of a type of predatory conduct the Sherman Act was designed to prevent. In closing these accounts, the Banks merely exercised their contractual right to sever their banking relationship with L & J at will. Moreover, these closings appear justified considering the defendants' concern with L & J's apparent lack of compliance with federal anti-money laundering laws. Accordingly, as L & J has failed to plead any facts that satisfy the requisite essential elements of a *prima facie* case under the Sherman Act for either monopolization or attempted monopolization, Count II and Count III of plaintiff's complaint will be dismissed.

### E. L & J Fails to Plead a Discrimination Claim

In Count IV of its complaint, L & J charges the Banks with "impermissible discrimination" for their acts in closing plaintiff's accounts, while continuing to do business with other, larger money remittance companies. Although this vague allegation makes no reference to any particular federal or local statute, it appears that L & J intended to bring a cause of action under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ["section 1981"] for the defendants' alleged refusal to deal with it. The plaintiff does not meet even the first requirement of alleging a case of unlawful

---

**9.** *See Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1079 (3d Cir.1978) (noting that specific intent to monopolize the relevant market is an essential element in a section 2 claim); *Unibrand Tire & Prod. Co., Inc. v. Armstrong Rubber Co.,* 429 F.Supp. 470, 476 (W.D.N.Y.1977) ("A specific intent to monopolize is universally accepted as a necessary element of the offense of attempted monopolization."); *see also Forro Precision, Inc. v. International Bus. Machs. Corp.,* 673 F.2d 1045, 1059 (9th Cir.1982) ("[W]here as here there is no proof of market power, the conduct to support an inference of specific intent to monopolize should be of a kind clearly threatening to competition or clearly exclusionary.").

# 560

discrimination.[10] Plaintiff does not allege that the Banks discriminated on any basis that has been recognized as improper, such as race, color, religion, sex, or national origin. Even assuming *arguendo* that plaintiff could satisfy the first prong, the defendants have a legitimate, nondiscriminatory reason for their actions as a matter of law, namely a concern for plaintiff's failure to comply with federal anti-money laundering laws such as the Bank Secrecy Act, 31 U.S.C. §§ 5311–5332, and the USA Patriot Act, Public Law 107–56, by not registering or filing reports with the Department of the Treasury pursuant to 31 U.S.C. § 5313 and 31 C.F.R. § 103.41(d). Accordingly, L & J has failed to plead a discrimination claim on which relief can be granted and, thus, Count IV must be dismissed.

## F. Remaining Counts Fail to State Claims Upon Which Relief Can Be Granted

■ Count V of the complaint alleges that the Banks closed L & J's accounts in order to increase their own business by "cornering the market" on money remittance clients. How exactly the closing of plaintiff's accounts would enable the Banks to corner the market in money transfers is unclear considering the Virgin Islands is home to numerous other businesses, such as Money Gram and Western Union, that provide identical services, a fact plaintiff does not dispute. Accordingly, Count V fails to state a claim upon which relief can be granted and must be dismissed.

Count VI alleges that the defendants' reliance on the USA Patriot Act in closing

plaintiff's accounts was misplaced. This claim suffers from several flaws. First, plaintiff points to no particular statute that would permit it to bring a cause of action under the Patriot Act. Second, the Banks argue that the Patriot has no relevance in this matter as they closed the accounts based upon their contractual right to do so. Finally, even if the defendants had relied on the Patriot Act, any such reliance appears to be proper in light of the plaintiff's own failings to abide by federal anti-money laundering laws. Thus, Count VI also fails to state a claim upon which relief can be granted and must be dismissed.

■ Finally, Count VII alleges that the defendants engaged in an "unjust taking" without due process. Apparently, L & J likens the Banks to governmental entities who have taken property interests without due process. Such a comparison is without precedent. *See Temple v. Inhabitants of City of Belfast*, 30 F.Supp.2d 60, 65 (D.Me.1998) ("In order to state an actionable procedural due process claim, Plaintiff must establish that he has been deprived of a constitutionally cognizable property or liberty interest by a state actor, and that such deprivation occurred without constitutionally adequate procedure"). Clearly the Banks are not state actors and any reference to unjust taking as protected by the Fifth and Fourteenth amendments is inapplicable. Moreover, the Banks have not retained any of plaintiff's property, but returned its deposits in full upon closing the accounts. Finally, any argument on the part of L & J to equate the closing of its accounts and the

---

**10.** *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *See Hines v. Caneel Bay*, Civ. No.2001–74, 2002 WL 31887699, *1, 2002 U.S. Dist. LEXIS 23585, *4–7 (D.V.I. Dec. 3, 2002) (describing the *McDonnell–Burdine–*

*Hicks* test); *Harley v. Caneel Bay, Inc.*, 193 F.Supp.2d 833, 835–36 (D.Vi.2002); *Hazell v. Exec. Airlines, Inc.*, 181 F.Supp.2d 444, 447–48 (D.Vi.2002) *Rajbahadoorsingh v. Chase Manhattan Bank*, 168 F.Supp.2d 496, 500–501 (D.Vi.2001).

potential result of its going out of business as a taking is misguided. If any factor might cause L & J to go out of business, it would be the plaintiff's own failure to comply with federal anti-money laundering laws. Therefore, Count VII fails to state a claim upon which relief can be granted and must be dismissed.

## III. CONCLUSION

L & J's complaint is fatally defective in its entirety. As banking services are not commodities and the Banks' refusal to deal with plaintiff is not unlawful in this situation, plaintiff's Clayton Act count (Count I) must be dismissed. Moreover, plaintiff's failure to plead any viable Sherman Act violation necessitates the dismissal of Count II and Count III. In addition, Counts IV, V, VI and VII must all be dismissed as L & J has not alleged claims for which relief can be granted.

## ORDER

For the reasons set forth in the foregoing Memorandum of even date, it is hereby

**ORDERED** that defendants' motion to dismiss plaintiff's complaint is **GRANTED**; it is further

**ORDERED** that plaintiff's complaint is **DISMISSED**.